ADKINS v THOMAS SOLVENT COMPANY

Docket No. 88897. Argued October 8, 1991 (Calendar No. 13). Decided
July 28, 1992.

Cora B. Adkins and twenty-one others brought an action in the
Calhoun Circuit Court against Thomas Solvent Company and
others, alleging negligence, continuing nuisance, continuing
trespass, strict liability, and ultrahazardous activities, and
seeking damages and injunctive relief for the contamination of
ground water generally as a result of the defendants' improper
handling of chemicals and industrial waste, while acknowledg-
ing that their properties had suffered no contamination. The
court, Robert Holmes Bell, J., granted summary disposition for
the defendants, concluding that any damages suffered by the
plaintiffs resulted from unfounded public perception. The Court
of Appeals, WEAVER, P.J., and BRENNAN and NEFF, JJ., re-
versed and remanded the case in an opinion per curiam,
holding that although no contamination had reached or would
reach the well water of the plaintiffs' properties, a physical
intrusion or physical effect is not required to sustain a claim
for nuisance (Docket No. 102137). The defendants appeal.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY,
GRIFFIN, and MALLETT, the Supreme Court *held*:

A claim for relief may not be maintained in nuisance for
property depreciation caused by environmental contamination
of ground water where it is acknowledged that the property in
question was not and never would be subject to ground water
contamination emanating from the defendants' property.

1. A private nuisance is an invasion without trespass of an
interest in the private use and enjoyment of land. While the
interference with use and enjoyment need not involve a tangi-
ble intrusion, it must be significant. Depreciation of property
value in the general vicinity of the plaintiff's property as a

REFERENCES

Am Jur 2d, Pollution Control §§ 468-474, 560.

Measure and element of damages for pollution of well or spring. 76
ALR4th 629.

Landowner's right to relief against pollution of his water supply by
industrial or commercial waste. 39 ALR3d 910.

result of unfounded public fears of ground water contamination alone is insufficient. Absent an activity or condition posing an unacceptable risk of actual injury or threat of danger to the plaintiff's property, there is not a significant interference with the use and enjoyment of the property, and thus no injury recoverable as a private nuisance.

2. To prove liability for private nuisance in a pollution contamination case, the plaintiff must show that the defendant was responsible for producing contaminants capable of interfering with the use and enjoyment of the plaintiff's property and that there was in fact a significant interference. In this case, the trial court did not err in dismissing the plaintiffs' claims. The diminution in property values at issue was not a significant interference with the use or enjoyment of the plaintiffs' property.

3. In this case, the plaintiffs stipulated that all claims except those involving property depreciation be dismissed. Thus, facts and counts in the pleadings with respect to other issues are not before the Court. It is to be assumed that the plaintiffs are motivated by legitimate interest in whether diminution in value is recoverable without a showing of substantial interference with use or enjoyment of property, an issue of considerable significance and not a hypertechnicality.

Justice RILEY, concurring, stated that the speculation that the Court will not hesitate to expand or even abandon on policy grounds the common-law view regarding nuisance is unwarranted.

Reversed and remanded.

Justice LEVIN, joined by Chief Justice CAVANAGH, dissenting, stated that the plaintiffs should be allowed to recover damages in nuisance on proofs introduced at a trial tending to show that the defendants actually contaminated soil and ground water in the neighborhood of the plaintiffs' homes with toxic chemicals and industrial wastes, that the market perception of the value of the plaintiffs' homes actually was adversely affected by the contamination of the neighborhood, and thus that the plaintiffs' loss was causally related to the defendants' conduct.

Although the plaintiffs have stipulated to relinquish the right to seek damages for interference with their use and enjoyment of property in forms distinct from depreciation, the disposition of this case should not depend on whether they so stipulated rather than continuing to insist on seeking to recover damages for personal injury as well as for a decline in market value. To rely on the plaintiffs' decision not further to seek damages for personal injury, a narrow point without legal foundation until

the majority's decision, reduces the jurisprudential significance of this case to a hypertechnicality, and encourages parties generally to give no quarter in litigation, lest the trial or an appellate court find against the stipulating on a hypertechnicality.

Preservation of property value, in itself, is a legally cognizable interest in this setting, whether any structure on the land is a home or rental or other commercial or industrial property. A condition, tortiously or intentionally created or maintained on neighboring property, that is a substantial and unreasonable nontrespassory interference with the use and enjoyment of property, may constitute a nuisance, may cause personal injury, property damage, or a reduction in the market value of property, and may be reflected in a reduction of the market value of a home although no personal injury or other property damage is suffered by the homeowner. Therefore, a homeowner should be permitted to maintain a nuisance action to recover damages for a decline in the market value of a home that reflects interference with its use and enjoyment by a condition tortiously created or maintained by the defendant on neighboring property, without demonstrating interference with use or enjoyment that might result in further, separately compensable injuries to persons or property.

In this case, in finding as a fact, without a trial on the merits, that any decline in the value of the plaintiffs' homes was attributable to unfounded fears, the majority proceeds on the assumption—without requiring the defendants to evidentially support, or providing the plaintiffs an opportunity to evidentially refute that assumption—that none of the reduction in value was attributable to well-founded concern about contamination by the defendants of soil and water supply in the neighborhood. Contrary to the majority's characterization of unfounded fear, it appears that the claimed reduction in the value of the plaintiffs' homes was attributable both to factually well-founded concern about contamination of the soil and water supply in the neighborhood and to unfounded concern of soil and water supply contamination with respect to the plaintiffs' homes.

Generally, where there are multiple causes of decline in value, the tortfeasor is subject to liability as long as the misconduct is *a* cause of the decline in market value; it need not be the *sole* cause of plaintiffs' loss.

In characterizing the issue as whether the plaintiffs may proceed with their claims of nuisance in fact *solely* on the basis of property depreciation due to public concern about contami-

nants in the general area, the majority proceeds on the assumption that this case presents an abstract, desiccated question of law, divorced from actual conditions that may face residents and prospective residents of the plaintiffs' neighborhood. Yet there is no basis in the record for assuming, without factual support, that the only change to plaintiffs' neighborhood caused by the contamination of property in the area is an attitudinal shift in the community or a statistical shift in the value of homes and other property in the neighborhood.

Fear-inspired property depreciation will support a nuisance action where the fears ordinarily would be experienced by a person confronting the activity conducted or the condition created or maintained on neighboring property, and where competent evidence establishes that the fears manifested themselves in a decline in the plaintiffs' property values. It is odd to assert that although relief is available against a defendant conducting a lawful business and committing no independently actionable wrong, it is unavailable where the plaintiffs' allegations, if proved, would render the defendants at least subject to liability to numerous property owners in the plaintiffs' immediate neighborhood. Further, if the proposed establishment of a lawful business may be enjoined as a nuisance in fact, a damage remedy should be available to compensate the plaintiffs for pecuniary harm already suffered as the result of unlawful or tortious conduct.

184 Mich App 693; 459 NW2d 22 (1990) reversed.

NUISANCE — ENVIRONMENTAL CONTAMINATION — PROPERTY DEPRECIATION.

A claim for relief may not be maintained in nuisance for property depreciation caused by environmental contamination of ground water where it is acknowledged that the property in question was not and never would be subject to ground water contamination emanating from the defendants' property.

*James B. Brown & Associates* (by *James B. Brown*), *Allen, Lippes & Shonn* (by *Richard J. Lippes,* pro hac vice), and *Cohen, Milstein, Hausfeld & Toll* (by *Jerry S. Cohen*) for the plaintiffs.

*Foster, Swift, Collins & Smith, P.C.* (by *John L. Collins, Charles E. Barbieri, Michael S. Wellman*), for the defendants.

Amici Curiae:

*McGinty, Brown, Jakubiak, Frankland, Hitch &*

*Henderson* (by *Kenneth P. Frankland*); *Wiley, Rein & Fielding,* of counsel (by *Thomas W. Brunner, Laura A. Foggan,* and *Francis M. Gaffney*), for American Insurance Association.

*Braun, Kendrick, Finkbeiner, Schafer & Murphy* (by *Bruce L. Dalrymple* and *Scott C. Strattard*) for Michigan Defense Trial Council.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, Susan J. Sadler, Rachelle G. Silberberg,* and *Daniel J. Kim*) for Michigan Manufacturers Association.

*Diane J. Britt* and *Jonathan Pierce* for Sierra Club Mackinac Chapter.

BOYLE, J. The question before us is whether a claim for relief may be maintained by plaintiffs who claim the right to damages in nuisance for property depreciation caused by environmental contamination of ground water despite testimony by both plaintiffs' and defendants' experts that their properties were not and would never be subject to ground water contamination emanating from the defendants' property.

The trial court dismissed these plaintiffs' claims on the basis that it found no support for recovery in Michigan law. The Court of Appeals reversed the decision of the trial court, rejecting its conclusion that the facts presented no cognizable claim for nuisance.

We are persuaded that the boundaries of a traditional nuisance claim should not be relaxed to permit recovery on these facts. Compensation for a decline in property value caused by unfounded perception of underground contamination is inextricably entwined with complex policy questions

regarding environmental protection that are more suitably resolved through the legislative process.

We reverse the decision of the Court of Appeals, reinstate the trial court's judgment in favor of defendants, and remand to the trial court for a continuation of proceedings as to the remaining plaintiffs.

I

In 1984, the plaintiffs sued the Thomas Solvent Company in the Calhoun Circuit Court for damages and injunctive relief from injuries allegedly resulting from the improper handling of chemicals and industrial waste. Claiming that the Thomas Solvent Company's and other defendants' improper handling and storage of toxic chemicals and industrial waste had contaminated the ground water, the plaintiffs brought claims sounding in negligence, continuing nuisance, continuing trespass, strict liability, and ultrahazardous activities.

Originally, approximately fifty plaintiffs brought suit against the Thomas Solvent defendants,[1] the Grand Trunk Railroad defendants,[2] Wesley E. Carter, a private individual doing business as Ray-

[1] Thomas Solvent Company is a Michigan corporation which owns and controls Thermo-Chem, Inc., TSC Transportation Company, Thomas Development Company/Thomas Transportation Company, Thomas Solvent Company of Detroit, Inc., Thomas Solvent Company of Muskegon, Inc., and Thomas Solvent, Inc. of Indiana. Richard Thomas is an individual who is or was an employee, officer or sole shareholder of Thermo-Chem, Inc., Thomas Solvent Company of Muskegon, Inc., Thomas Solvent Inc. of Indiana, Thomas Solvent Company of Detroit, Inc., Thomas Development Company/Thomas Transportation Company, and TSC Transportation Company.

[2] Grand Trunk Western Railroad Corporation allegedly owned and operated a number of sites at which contaminants were improperly handled. Grand Trunk Corporation is the corporation which owns Grand Trunk Western Railroad. Both Grand Trunk Western Railroad and Grand Trunk Corporation are owned and operated by Canadian National Railways Company Limited.

mond Road Landfill and O.K. Wrecking Company, and Hannah's Cement Products, Inc., the lessor of the land used as Raymond Road Landfill. The plaintiffs claimed that toxic chemicals and industrial wastes were released accidentally or intentionally at sites owned by the defendants. The plaintiffs complained of contaminants emanating from two sites owned or operated by the Thomas Solvent defendants. The plaintiffs alleged that contamination issued from a facility on Raymond Road which included an office building, a warehouse, a dock for storing drums, and twenty-one underground bulk storage tanks. In addition, the plaintiffs complained that contamination stemmed from a facility on Emmett Street, which the Thomas Solvent defendants allegedly leased from Grand Trunk Western Railroad. The Emmett Street facility included two underground bulk storage tanks, one aboveground tank, and a loading dock adjacent to a railroad spur. The plaintiffs also complained that contamination originated at the Raymond Road Landfill.

In 1985, the complaint was amended and approximately nineteen plaintiffs were added. Discovery continued, and various motions for summary disposition were brought as the parties and the court sought to sharpen and narrow the issues. As discovery continued, it became clear that contaminants allegedly discharged into the ground water by the defendants never reached these plaintiffs' property. The plaintiffs' expert, Yaron Sternberg, concluded that a ground water divide separated the flow of ground water in the area, with water on the north side of the divide flowing generally north or northwesterly and the water on the south side of the divide flowing in a westerly direction. He testified that no contaminants from the Thomas Solvent facilities had any effect on the

properties of these plaintiffs, which were located south of the divide.

This appeal involves the claims of twenty-two plaintiffs who live over 2000 feet south and east from the Thomas Solvent facilities and whose claims were eventually dismissed by the trial court. The Grand Trunk Railroad defendants filed a motion for summary disposition, seeking to dismiss the claims of those plaintiffs whose property was not affected by the contaminants allegedly released by Grand Trunk. The Thomas Solvent defendants joined in the motion.[3] The plaintiffs filed a responsive brief and stipulated that the claims of these twenty-two litigants be dismissed except to the extent that they claimed damages for property depreciation. On June 16, 1987, the trial court heard oral arguments on the motion. The plaintiffs argued that a tortious event and a range of damages occurred when toxic substances left the defendants' property. They conceded that no contaminants ever reached these twenty-two plaintiffs' property, but urged the court to impose liability on the defendants for any loss in property values due to public concern about the contaminants in the general area. Concluding that any damages that these plaintiffs suffered resulted from unfounded public perception that their ground water was contaminated, the trial court dismissed their claims. On June 29, 1987, an order was entered, dismissing the property depreciation claims of these twenty-two plaintiffs against the Thomas Solvent defendants and concluding that no reason existed for delay and that a final judgment should enter in favor of the Thomas Solvent

[3] The plaintiffs subsequently withdrew their appeal in the Court of Appeals regarding the trial court's dismissal of their claims against the Grand Trunk Railroad defendants. Only the Thomas Solvent defendants are parties to this appeal.

defendants. The plaintiffs moved for reconsideration and to amend their complaint to add claims regarding contamination of municipal well water. The trial court denied these motions.[4]

The plaintiffs claimed an appeal as of right from the trial court's summary disposition order. The Court of Appeals reversed the trial court's order and remanded the case to the trial court for further proceedings. Recognizing that no contamination had reached or would reach the well water of the plaintiffs, the Court of Appeals nevertheless concluded that the trial court had erred in finding that the plaintiffs had not shown some damage "and in summarily dismissing plaintiffs' claims merely because the ground water beneath their properties had not been contaminated." 184 Mich App 693, 696; 459 NW2d 22 (1990). Emphasizing that to recover damages for nuisance, a litigant need not show physical intrusion onto the land, and distinguishing nuisance from trespass, the Court of Appeals relied on this Court's opinions in *Whittemore v Baxter Laundry Co,* 181 Mich 564; 148 NW 437 (1914), and *Hadfield v Oakland Co Drain Comm'r,* 430 Mich 139, 151; 422 NW2d 205 (1988), citing Prosser & Keeton, Torts (5th ed), § 87, p 622.

This Court granted the defendants' application for leave to appeal to consider whether the Court

---

[4] With these motions, the plaintiffs sought relief from the trial court's conclusion that no claims regarding contamination of municipal well water had been preserved by the stipulation. The trial court also concluded that the first amended complaint did not encompass claims based on purported contamination of municipal water. The trial court further refused to permit the amendment of the complaint because the plaintiffs had been aware of these potential claims and failed to raise them earlier. To the extent that the plaintiffs seek to rely on contamination of municipal water in support of their nuisance claims, those allegations are not properly before us since the plaintiffs failed to appeal from the trial court's order denying leave to amend their complaint.

of Appeals erred when it reversed the trial court's summary disposition order. 437 Mich 929 (1991).

## II

The trial court granted the defendants' motion for summary disposition pursuant to MCR 2.116(C)(10). The parties had agreed, both in a stipulation filed with the court and during oral argument on the motion, that no ground water contamination from the defendants' property ever reached the plaintiffs' property because of a ground water divide which acted as a hydrogeological barrier that precluded the possibility of migration of any contaminants from defendants' property. The trial court concluded that the defendants would be entitled to judgment as a matter of law. *General Motors Corp v Detroit,* 372 Mich 234; 126 NW2d 108 (1964), cert den 377 US 977 (1964). For a summary disposition to be upheld on appeal, the Court must review the record to ascertain whether the defendants would have been entitled to the judgment as a matter of law. *American Employers' Ins Co v Christman & Bros Co,* 284 Mich 36; 278 NW 750 (1938).

The Court of Appeals held that because a physical intrusion or physical effect is not required to sustain a claim for nuisance, the trial court erred in dismissing the plaintiffs' claims. For the reasons that follow, we find that the trial court did not err in dismissing the claims.

## III

Historically, Michigan has recognized two distinct versions of nuisance, public nuisance and private nuisance. *Hadfield, supra,* p 205. A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land.

4 Restatement Torts, 2d, § 821D, p 100. It evolved as a doctrine to resolve conflicts between neighboring land uses.[5] Because nuisance covers so many types of harm, it is difficult to articulate an encompassing definition. Imprecision in defining nuisance leads to confusion regarding the interest it is designed to protect.[6] Nevertheless, the gist of a private nuisance action is an interference with the occupation or use of land or an interference with servitudes relating to land.[7] There are countless ways to interfere with the use and enjoyment of land including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment. The essence of private nuisance is the protection of a property owner's or occupier's reasonable comfort in occupation of the land in question. Prosser & Keeton, *supra,* p 619. It involves "not only a defect, but threatening or impending danger . . . to the property rights or health of persons sustaining peculiar relations to the same . . . ." *Kilts v Kent Co Supervisors,* 162

[5] Pfennigstorf, *Environment, damages, and compensation,* 1979 Am B Found Res J 347, 386. See, generally, Calabresi & Melamed, *Property rules, liability rules, and inalienability: One view of the cathedral,* 85 Harv L R 1089 (1972).

[6] One commentator pointed out that Blackstone's definition was so broad it could encompass not only all nuisances, but all wrongs. McClintock, Principles of Equity (2d ed), p 363 quoting 3 Blackstone, Commentaries, c 11 (Chase's 3d ed, 1892), p 738. Blackstone's definition of nuisance was " 'anything that worketh hurt, inconvenience or damage.' " *Id.*

[7] Paton, *Liability for nuisance,* 37 Ill L R 1, 8-9 (1942). See also Newark, *The boundaries of nuisance,* 65 L Q R 480, 487-488 (1949). Newark explains the early common-law origins of the tort in the assize of nuisance, a remedy available for harm to the plaintiff's enjoyment of rights over land. Gradually, the action upon the case for nuisance became the sole common-law remedy over the assize of nuisance. Winfield, *Nuisance as a tort,* 4 Cambridge L J 189, 190-191 (1931). The action upon the case, the forerunner of today's nuisance action, was available only for damages, not abatement. *Id.* at 192.

Mich 646, 651; 127 NW 821 (1910).[8] The pollution of ground water may constitute a public or private nuisance. 4 Restatement Torts, 2d, § 832, p 142.

According to the Restatement, an actor is subject to liability for private nuisance for a nontrespassory invasion of another's interest in the private use and enjoyment of land if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct. 4 Restatement Torts, 2d, §§ 821D-F, 822, pp 100-115.

Prosser & Keeton's enumeration of the requirements to recover on a private nuisance theory is similar. They set forth the following requirements:

(1) The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use;

(2) There was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended;

(3) The interference that resulted and the physical harm, if any, from that interference proved to be substantial. It is this requirement and the next that is most important in distinguishing between trespassory-type invasions from those that are actionable on a nuisance theory. Any intentional and unprivileged entry on land is a trespass without a showing of damage, since those who own land have an exclusive right to its use; but an act

---

[8] A public nuisance involves the unreasonable interference with a right common to all members of the general public. *Garfield Twp v Young*, 348 Mich 337, 342; 82 NW2d 876 (1957); 4 Restatement Torts, 2d, § 821B, p 87.

that interferes with use but is not in itself a use is not actionable without damage. The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct;

(4) The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land. This does not mean that the defendant's conduct must be unreasonable. It only means that the interference must be unreasonable and this requires elaboration.[9] [Prosser & Keeton, *supra,* pp 622-623.]

Once these general definitions have been stated, application to any given set of facts is, nevertheless, problematic. Despite almost a century during which this Court has repeatedly recognized the difficulty in defining the concept of nuisance,[10] Michigan jurisprudence has focused on delineating the contours of various defenses, but has seldom elaborated the elements and proofs necessary to sustain a claim in nuisance absent special defenses. In this case, the Court considers whether property depreciation based on unfounded fears falls within the boundaries of an action for private nuisance in Michigan.

The plaintiffs alleged that the defendants' improper handling and storage of toxic chemicals and hazardous waste contaminated underground water in the area, thus supporting their recovery of money damages for nuisance. Although the plaintiffs' first amended complaint failed to specify whether their claims were founded on public or private nuisance, the parties have argued, and the

[9] We are not presented in this case with the occasion to consider the distinctions between the two definitions.

[10] See, e.g., *Kilts, supra,* p 651; *Awad v McColgan,* 357 Mich 386, 389-390; 98 NW2d 571 (1959); *Rosario v Lansing,* 403 Mich 124, 131; 268 NW2d 230 (1978); *Hadfield, supra,* p 150.

case was considered in the lower courts pursuant to, a theory of private nuisance.[11]

The Court of Appeals focused upon the lack of any physical intrusion onto plaintiffs' land, stressing that an interference with the use and enjoyment of land need not involve a physical or tangible intrusion. We do not disagree with this rule of law.[12] Nevertheless, we conclude that the trial court properly found that the plaintiffs failed to trace any significant interference with the use and enjoyment of land to an action of the defendants.

The crux of the plaintiffs' complaint is that publicity concerning the contamination of ground water in the area (although concededly not their ground water) caused diminution in the value of the plaintiffs' property. This theory cannot form the basis for recovery because negative publicity resulting in unfounded fear about dangers in the vicinity of the property does not constitute a significant interference with the use and enjoyment of land.[13]

---

[11] Even if the plaintiffs had argued the case on a public nuisance theory, recovery would be unavailable. Although the contamination of ground water may give rise to an action for public nuisance, the plaintiffs must show harm of a kind different from that suffered by other members of the general public exercising the right common to the general public that was the subject of interference. 4 Restatement Torts, 2d, § 821C, p 94. See, e.g., *Philadelphia Electric Co v Hercules, Inc,* 762 F2d 303 (CA 3, 1985). These plaintiffs concede that no contamination reached the ground water underlying their properties. Thus, there exists no evidence of harm of a different kind than that suffered by members of the general public.

[12] Both Prosser and Keeton's definition of nuisance and the definition provided by the Restatement of Torts specifies that an action for nuisance involves a *nontrespassory* invasion of property rights. 4 Restatement Torts, 2d, § 821D, p 100. Thus, it is clear that a tangible physical intrusion is not necessary.

[13] Contrary to the approach of the dissent (see *post,* § v, parts D and E, and Appendix, p 365, n 114), we do not deal here with fear that depresses property values as an element of damages where a basis for liability is otherwise established. Nor do we deal with the issue of the hypersensitive individual. The Restatement example referenced (*post,* pp 355-356), illustrates the defect in the plaintiffs' theory. The deafness

Examination of the historic development of nuisance law helps to clarify the fallacy underlying plaintiffs' theory of recovery. Initially, the assize of novel disseisin was available for a complainant whose enjoyment of his free tenement was disturbed by the defendant. The tort of trespass later developed to remedy this situation in which the defendant interfered with the complainant's interest in land. The source of the injury was always on the complainant's land.[14] Later, the assize of nuisance arose to redress injury due to an act of the defendant that interfered with the complainant's interest, although the injury did not involve an entry onto the complainant's land.[15] Eventually, the action for trespass upon the case for nuisance developed. The appeal of this form of action was its remedy, damages, rather than abatement.[16]

The doctrine of nuisance traditionally encompassed geographic, temporal, and proprietary aspects. In geographic terms, nuisance arose when occupants of neighboring land had a dispute, typically over the proper use of the defendant's land.[17]

of the plaintiff does not prevent the existence of genuine interference, i.e., the enjoyment of entertaining guests. The Restatement does not suggest that absent an interference with the use and enjoyment of land, the deaf person could recover on the basis that hearing persons would not pay as much for his house. That is the appropriate analogy to the facts of this case. Likewise, according to the Restatement, a cognizable claim of nuisance will lie where conduct is otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct, *provided* there is a nontrespassory invasion of another's interest in the use and enjoyment of land. (*Post,* § III, pp 341-343.)

[14] McRae, *The development of nuisance in the early common law,* 1 U Fla L R 27, 29-30 (1948).

[15] Winfield, *Nuisance as a tort,* n 7 *supra,* pp 190-191. Prosser & Keeton agree that the assize of nuisance originated as a writ designed to "cover invasions of the plaintiff's land due to conduct wholly on the land of the defendant." Prosser & Keeton, *supra,* § 86, p 617.

[16] Winfield, n 7 *supra,* pp 191-192, 201-203.

[17] The geographic aspect of nuisance law limits claims in two areas. First, courts have typically refused to allow a successor landowner to

This Court articulated a geographic component to liability for nuisance in *Kilts, supra,* p 650. The *Kilts* Court differentiated between a weak structure on a private person's land "so far from the street and other's property" that it would not constitute a nuisance and a structure that "was adjacent to an adjoining proprietor's land so that it was a menace to his property, or to his person in the use of his land . . . ." *Id.*

In temporal terms, nuisance normally required some degree of permanence. If the asserted interference was "temporary and evanescent," there was no actionable nuisance.[18] This requirement is normally subsumed in the question whether the interference with the use and enjoyment of property is substantial. In proprietary terms, nuisance required that the plaintiff have some interest in the land that was interfered with. Unlike the early assize of novel disseisin, nuisance did not limit suit to freeholders, but permitted lessees and then occupants to sue.[19]

As the doctrine of trespass was gradually transmuted into the action upon the case for nuisance, the requirement that the injury involve entry onto the complainant's land was eliminated.[20] To limit

seek damages under a nuisance theory because the landowner's claim does not involve an interference with *adjoining* land. See, e.g., *Amland Properties Corp v ALCOA,* 711 F Supp 784; 29 ERC 1538 (D NJ, 1989). Second, courts have typically rejected liability where a litigant failed to establish proximity between the asserted interference and the litigant's property. See, e.g., *Renaud v Martin Marietta Corp,* 749 F Supp 1545; 32 ERC 1721 (D Colo, 1990).

[18] Newark, n 7 *supra,* p 489.

[19] McRae, n 14 *supra,* pp 40-41. Although recently courts in some jurisdictions have considered whether to expand this proprietary rights aspect to include various successor interests, the rationale employed even under this expanded approach, continues to rely upon the notion that nuisance is intended to protect against interference with the use and enjoyment of land. See, e.g., *Amland,* n 17 *supra,* pp 807-808.

[20] See McRae, n 14 *supra,* pp 37-38.

the broader action on the case for nuisance, courts
added the requirement that a litigant seeking to
recover for nuisance must show a legally cogniza-
ble injury, requiring proof of a significant interfer-
ence with the use and enjoyment of land.[21] Al-
though much confusion has arisen because of the
failure to discern that injury and damage are
different concepts, an interference that is not sub-
stantial and unreasonable does not give rise to an
action for damages against the person causing it,
damnum absque injuria.[22] Stated otherwise, while
nuisance may be predicated on conduct of a defen-
dant that causes mental annoyance, it will not
amount to a substantial injury unless the annoy-
ance is significant and the interference is unrea-

[21] Early cases rejecting liability because there was damnum absque
injuria were discussed by McRae, n 14 *supra.* As early as 1332, an
English court held that damages alone were not enough. McRae
explains that "if a man erected a mill upon his land and so sub-
tracted customers from his neighbor's mill, his neighbor suffered
*damnum* but there might be no *injuria." Id.,* p 38, citing YB 7 Edw
III, Mich, pl 27 (1332). McRae mentions an additional example in
which recovery was denied where the complainants sought to recover
for a loss of income because of the defendant's establishment of a
rival school. *Id.,* citing *Gloucester Grammar School Case,* YB 11 Hy
IV, Mich, pl 21 (1409).

[22] Smith, *Reasonable use of one's own property as a justification for
damage to a neighbor,* 17 Colum L R 383, 386-390 (1917). Likewise,
McRae explains that the "common factor in all of these cases [actions
on the case for nuisance] is that defendant's act was in each case a
misfeasance, a misfeasance of a type which would not sustain tres-
pass, and which was *damnum* and *injuria." McRae, n 14 supra,* p 39.
(Emphasis in original.) Early Michigan authorities discussed this
concept as well. See *Grand Rapids & Indiana R R Co v Heisel,* 38
Mich 62; 31 Am Rep 306 (1878). There, the Court concluded that a
railroad's use of a public highway to lay railroad tracks could not be
deemed a nuisance with respect to the litigant until the use of the
street unreasonably interfered with his property. The Court noted
that a lot owner with proprietary rights in the street might sue for
the wrongful encumbrance upon his property and recover for dimin-
ished market value or decreased rental value. However, because this
litigant lacked proprietary rights in the street, the Court concluded
that "diminution . . . occasioned by the placing of the track in the
street" was damnum absque injuria with regard to him until the
railroad's use of the tracks resulted in unnecessary noise or other
legal grievance affecting his property. *Id.,* p 71.

sonable in the sense that it would be unreasonable
to permit the defendant to cause such an amount
of harm without paying for it.[23]

Nuisance on the case thus involved the common
law's attempt to ensure accommodation between
conflicting uses of adjoining property. An early
opinion from this Court explains:

> As a rule, the owner may make such use of his
> premises as his business or taste may dictate, and
> the only limitation upon his right is that he must
> so use his property as not to cause injury to the
> property or rights of those owning property in the
> vicinity. [*McMorran v Fitzgerald,* 106 Mich 649,
> 652; 64 NW 569 (1895).]

Because the doctrine sought to acknowledge the
right of both the property owner to carry out a
particular use and the neighbor whose property or
use and enjoyment of property might be injured by
the use, de minimus annoyances were not action-
able. Only for a substantial interference with the
use and enjoyment of property would an action lie.
As a part of this scheme, courts frequently con-
cluded that diminution in property values alone
constitutes damnum absque injuria.[24]

The reasoning in *Gunther v E I DuPont de*

---

[23] Prosser & Keeton, *supra,* § 88, p 626. The common-law develop-
ment of trespass, like nuisance, is also illustrative of a need to limit
recovery to a proper case. In *Bradley v American Smelting & Refining
Co,* 104 Wash 2d 677, 690-691; 709 P2d 782 (1985), the court discussed
the modern view of trespass, which allowed recovery for indirect
invasions of property such as those caused by smoke or air particles.
Airborne particles might also give rise to an action in nuisance. To
avoid "sanctioning actions in trespass by every landowner within a
hundred miles of a manufacturing plant," the court interposed the
actual and substantial damages requirement. *Id.,* p 692. The substan-
tial interference doctrine achieves the same purpose in nuisance law.

[24] The Iowa Supreme Court explained that absent a nuisance, a
"use cannot be enjoined because of, or damages recovered for, the
diminution in value of neighboring properties resulting therefrom."
*Bader v Iowa Metropolitan Sewer Co,* 178 NW2d 305, 307 (Iowa,
1970).

*Nemours & Co,* 157 F Supp 25 (ND W Va, 1957),
app dis 255 F2d 710 (CA 4, 1958), exemplifies this
reluctance to find a nuisance for mere diminution
of property value on the basis of unfounded beliefs
or fear of injury. In *Gunther,* the plaintiffs unsuc-
cessfully sought damages and injunctive relief for
claimed injuries to their property and person from
test explosions conducted by the defendant in the
vicinity of their property. The court refused to find
nuisance, reasoning:

> The Court believes it a fair inference from the
> evidence that the Gunthers' enjoyment of their
> property was lessened because *they believed* that
> the test blasting had injured them. If such belief is
> unfounded, what is left other than depreciation in
> value? Mere diminution of the value of property
> because of the use to which adjoining or nearby
> premises is devoted, if unaccompanied with other
> ill results, is *damnum absque injuria*—a loss with-
> out injury, in the legal sense. [*Id.,* p 33. Emphasis
> in original.]

That same reasoning applies to this case. Plaintiffs
have stipulated the dismissal of all claims except
those predicated upon an alleged depreciation in
the market value of the property because of the
unfounded fears of purchasers. The fact, as the
dissent recognizes, that plaintiffs make no claim
for "relief arising out of their own 'fears,' " *post,* p
362, illustrates the point that defendants' activi-
ties have not interfered with their use and enjoy-
ment of property.[25]

This Court has held that property depreciation
alone is insufficient to constitute a nuisance. *Plas-
sey v S Loewenstein & Son,* 330 Mich 525, 530; 48

---

[25] See also *Winget v Winn-Dixie Stores, Inc,* 242 SC 152; 130 SE2d
363 (1963) (absent proof of a nuisance, no recovery of damages can be
allowed for the diminution in value because of the lawful use of
property made by a nearby owner).

NW2d 126 (1951); *Warren Twp School Dist v Detroit,* 308 Mich 460, 469-470; 14 NW2d 134 (1944); *Garfield Twp v Young,* 348 Mich 337; 82 NW2d 876 (1957). Although there is early authority to the contrary involving circumstances largely subsumed in zoning regulations,[26] most recently this Court has held that a cause of action for nuisance may not be based on unfounded fears.[27] *Smith v Western Wayne Co Conservation Ass'n,* 380 Mich 526, 543; 158 NW2d 463 (1968). In *Smith,* the plaintiffs sought to have a gun range declared a nuisance, contending that it created fear of injuries, thus decreasing their property values. Adopting the trial court's opinion that "no real or actual danger" existed from the use of the gun range, the Court further held that, even assuming a decrease in property values, this was not "in itself sufficient to constitute a nuisance." *Id.,* pp 542-543.[28]

Just as the development of nuisance on the case responded to the limitations of trespass by recognizing a cause of action when there was damage, but not injury amounting to use, the modern formulation of nuisance in fact, acknowledges changing conditions by declining to recognize a cause of action where damage and injury are both predicated on unfounded fear of third parties that depreciates property values. The rationale may be

[26] See, e.g., Prosser & Keeton, *supra,* § 87, p 620, ns 18 and 19.

[27] Plaintiffs successfully argued in the Court of Appeals that *Smith* was distinguishable on the basis that it involved a suit for injunctive relief, not damages. While the observation is correct, it is a non sequitur. The issue here is whether an action in damage for nuisance in fact can be predicated upon unfounded fears of ground water contamination. See *Exxon Corp v Yarema,* 69 Md App 124, 151, n 5; 516 A2d 990 (1986) (concluding that one standard applies to nuisance actions in law and in equity).

[28] See also *Henkel v Detroit,* 49 Mich 249; 13 NW 611 (1882) (even if the value of property was diminished by the city's market regulations that increased market wagons and traffic to the detriment of the plaintiff's property value, the complainant has suffered no compensable injury)..

expressed by observing that reasonable minds cannot differ that diminished property value based on unfounded fear is not a substantial interference in and of itself. Thus, in rejecting a claim that tort liability could be based on the creation of fear that depreciates property values, one federal district court observed that the theory was based on "a public reaction which is conjectural, transitory and ephemeral." *Good Fund, Ltd—1972 v Church,* 540 F Supp 519, 534 (D Colo, 1982), rev'd on other grounds sub nom *McKay v United States,* 703 F2d 464 (CA 10, 1983).[29]

This response also corresponds with the historical premise underlying tort liability for nuisance in fact, i.e., that when some significant interference with the use and enjoyment of land causes the property value loss, courts of law accommodate conflicting interests by recognizing claims designed to shift the loss.[30] However, on the present state of the record, plaintiffs do not contend that the condi-

[29] See *McCaw v Harrison,* 259 SW2d 457, 458 (Ky, 1953) (no actual danger of contamination of ground water from a cemetery and depreciation of property values alone was not enough to support a claim in nuisance); *Miller v Cudahy Co,* 567 F Supp 892, 897-898 (D Kan, 1983), aff'd in part and rev'd in part on other grounds 858 F2d 1449 (CA 10, 1988) (salt allegedly polluted area ground water but partial summary disposition was appropriate with regard to those sites outside the aquifer and those which the plaintiffs failed to show that the pollution reached); cf. *O'Donnell v Oliver Iron Mining Co,* 273 Mich 27; 262 NW 728 (1935) (refusing damages for property depreciation caused by fear of damage to property absent actual damage in a negligence action).

[30] Although some commentators analyzing the availability of nuisance actions to solve problems arising from environmental contamination have deplored the difficulties of showing that a significant interference exits, it is generally accepted that some interference with a use is required for recovery. See, generally, Reitze, *Private remedies for environmental wrongs,* 5 Suffolk U L R 779, 800 (1971); comment, *A private nuisance approach to hazardous waste disposal sites,* 7 Ohio N U L R 86, 100-101 (1980); comment, *Groundwater pollution in the western states—Private remedies and federal and state legislation,* 8 Land & Water L R 537, 539-544 (1973); comment, *The environmental lawsuit: Traditional doctrines and evolving theories to control pollution,* 16 Wayne L R 1085, 1109-1114 (1970).

tion created by the defendant causes them fear or anxiety. Thus, not only have these plaintiffs not alleged significant interference with their use and enjoyment of property, they do not here posit any interference at all.

Plaintiffs correctly observe that property depreciation is a traditional element of damages in a nuisance action. See, e.g., Prosser, *supra*, § 89, pp 637-640. We are not persuaded, however, and the dissent has not cited authority to the contrary, that an allegation of property depreciation alone sets forth a cognizable claim in private nuisance of significant interference with the use and enjoyment of a person's property. Diminution in property values caused by negative publicity is, on these facts, damnum absque injuria—a loss without an injury in the legal sense.

Contrary to the dissent's observation, neither *Garfield Twp, Smith, Plassey,* nor *Warren Twp School Dist* stand for the proposition that plaintiffs in this case have a cognizable claim of nuisance. Defendant's business is a lawful business, and the fact that violations of the law may have occurred on the property does not make the conduct of the business a nuisance in fact. Indeed, *Garfield Twp* rejects the precise argument upon which the dissent relies.[31]

---

[31] In *Garfield Twp,* the township sought to enjoin a junkyard operating in violation of a licensing ordinance. Rejecting the township's argument that the operation of the junkyard without a license rendered it a nuisance per se, the Court ruled that factual support was required to prove nuisance; illegal conduct alone was not enough. The *Garfield* Court relied on an opinion issued in 1875, which explained:

The erection of a wooden building within the limits of a city or village is not in and of itself a nuisance. Neither does the fact that the erection of such is prohibited by ordinance make it a nuisance. If this were so, then the doing of any act prohibited by law would, upon the same reasoning, be a nuisance. The act, if prohibited, would be illegal; but something

Nor can we accept the dissent's suggestion that because some authorities relied on here involve claims for equitable relief, they do not support a damage award in this case. We agree that different considerations apply to the remedies appropriate, and that injunctive relief is sometimes available when a tort is merely threatened or denied on the basis that damage is the more appropriate relief. In both law and equity, however, there must be a cognizable claim of a substantive interest invaded or threatened. Thus the dissent misperceives the use of authority holding that equitable relief is not available to address unfounded fears. Our point is that unfounded fears cannot constitute an allegation of a nuisance in fact with regard to these plaintiffs.[32]

We are thus unpersuaded by the dissent's attempt to avoid the stipulation of the parties by referring throughout the opinion to facts and counts that are not before us. Nor do we find convincing the dissent's disparagement of the 600-year provenance of the concept of damage without injury, or the assertion that the assumption on which we proceed "presents an abstract, desiccated

more than mere illegality is required to give this court jurisdiction. [*Village of St Johns v McFarlan,* 33 Mich 72, 74; 20 Am Rep 671 (1875).]

[32] For similar reasons, the cases involving fears of the owners of property as constituting nuisance in fact, or prima facie nuisance, such as the slaughterhouse in *Conway v Gampel,* 235 Mich 511; 209 NW 562 (1926), or businesses moving into otherwise long-established residential neighborhoods, do not establish that property depreciation on the basis of unfounded fear of third parties makes out a compensable allegation of nuisance in fact. Indeed, *Kundinger v Bagnasco,* 298 Mich 15; 298 NW 386 (1941), upon which the dissent relies, while rejecting the notion that it was necessary to show danger from disease or unpleasantness of odors, itself points to the need to show invasion of a legally cognizable interest, i.e., a nuisance in fact. "Emotions . . . are more acute in their painfulness, in many cases, than suffering perceived through the senses; and mental pain and suffering are elements of damage, in the eyes of the law." *Id.,* p 17.

question of law . . . ." (*Post,* p 328.) Unlike the dissent, we proceed on the assumption the parties presented to us. We do not know why counsel chose not to assert claims of personal discomfort or annoyance as he did with regard to other plaintiffs, or to appeal from the trial court's order denying leave to amend. These were probably strategy decisions based on his clients' responses in discovery. We are entitled to assume that counsel's present posture is motivated by legitimate interest in securing an appellate court decision that diminution in value is recoverable without a showing of substantial interference with use or enjoyment of property. In that event, these plaintiffs could become judgment creditors in the bankruptcy action. So viewed, the structuring of this lawsuit involves not a hypertechnical issue, but an issue of considerable significance to these plaintiffs, to litigants similarly situated, and to the jurisprudence.

In short, we do not agree with the dissent's suggestion that wholly unfounded fears of third parties regarding the conduct of a lawful business satisfy the requirement for a legally cognizable injury as long as property values decline. Indeed, we would think it not only "odd" (LEVIN, J., *post,* p 349), but anachronistic that a claim of nuisance in fact could be based on unfounded fears regarding persons with AIDS moving into a neighborhood, the establishment of otherwise lawful group homes for the disabled, or unrelated persons living together,[33] merely because the fears experienced by third parties would cause a decline in property values.[34]

---

[33] See, e.g., *Nicholson v Connecticut Half-Way House, Inc,* 153 Conn 507; 218 A2d 383 (1966).

[34] Finally, with respect to *Exxon Corp v Yarema,* n 27 *supra,* the case is factually distinguishable. We have no claim ·of contaminated well water or the preclusion of sale. This case comes to us singularly

When appropriate, we have not hesitated to examine common-law doctrines in view of changes in society's mores, institutions, and problems, and to alter those doctrines where necessary. *Myers v Genesee Co Auditor,* 375 Mich 1, 7; 133 NW2d 190 (1965); *Gruskin v Fisher,* 405 Mich 54, 58; 273 NW2d 893 (1979); *Placek v Sterling Heights,* 405 Mich 638, 656-657; 275 NW2d 511 (1979); *People v Aaron,* 409 Mich 672, 722-723; 299 NW2d 304 (1980); *Falcon v Memorial Hosp,* 436 Mich 443, 472-473; 462 NW2d 44 (1990).[35] In a given case, the dangers posed by environmental contamination may not be adequately addressed by statutorily created private actions or by traditional rules adopted prior to the existence of these problems.[36] This case does not present that situation. We do not deal with a situation here in which plaintiffs have alleged that "the character of the neighborhood has changed for the worse." (*Post,* p 328.) Nor have plaintiffs asserted that "an unusual number of abandoned, neglected, and otherwise depressed

on the issue whether plaintiffs may proceed with their nuisance in fact claims solely on the basis of property depreciation due to public concern about contaminants in the general area. *Exxon* confirms that they could not. *Id.,* pp 151-152.

[35] The authority to modify the common law is embodied in Const 1963, art 3, § 7:

> The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.

[36] Both state and federal statutes exist which provide for potential remedies including a private cause of action for various forms of pollution. See, e.g., The Comprehensive Environmental Response, Compensation & Liability Act (CERCLA), 42 USC 9601 *et seq.;* the Solid Waste Disposal Act, 42 USC 6901 *et seq.;* the Environmental Response Act, MCL 299.601 *et seq.;* MSA 13.32(1) *et seq.;* the Environmental Protection Act, MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.;* the Hazardous Waste Management Act, MCL 299.501 *et seq.;* MSA 13.30(1) *et seq.,* the Solid Waste Management Act, MCL 299.401 *et seq.;* MSA 13.29(1) *et seq.*

properties in the neighborhood" interfered with their use and enjoyment of land. (*Post,* p 328.) After defendants moved for summary disposition against any claims by plaintiffs who failed to show that their properties or persons were contaminated by exposure to chemicals emanating from the defendants, counsel stipulated to dismiss all claims of this group of plaintiffs except those based upon property depreciation. Thus, we are not presented with plaintiffs who allege an increased risk of illness, threat to safety, or lack of a habitable dwelling caused by contaminants released by the defendants.

The plaintiffs concede that a ground water divide prevented the migration of contaminated water to their property. Nevertheless, the plaintiffs seek to recover for damages because the defendants allegedly contaminated property in the general area. Under such a theory, a cause of action could be stated on behalf of any individual who could demonstrate an effect on property values even if the polluted ground water had neither strayed from defendants' own property, nor disturbed a plaintiff's enjoyment by the fear that it would do so.

If any property owner in the vicinity of the numerous hazardous waste sites that have been identified[37] can advance a claim seeking damages when unfounded public fears of exposure cause property depreciation, the ultimate effect might be a reordering of a polluter's resources for the benefit of persons who have suffered no cognizable

---

[37] Seventy-seven Michigan hazardous waste sites are on the National Priorities List. 56 Fed Reg 5606-5627 (February 11, 1991); 40 CFR 300 App B (1992). In addition, the Department of Natural Resources, pursuant to the Environmental Response Act, 1982 PA 307, MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.,* has identified approximately 2,837 sites of environmental contamination throughout the state. Department of Natural Resources, *Michigan Sites of Environmental Contamination, Act 307* (March, 1991), p 9.

harm at the expense of those claimants who have
been subjected to a substantial and unreasonable
interference in the use and enjoyment of proper-
ty.[38] Thus, while we acknowledge that the line
drawn today is not necessarily dictated by the
spectral permutations of nuisance jurisprudence, if
the line is to be drawn elsewhere, the significant
interests involved appear to be within the realm of
those more appropriate for resolution by the Legis-
lature.[39] Crampton & Boyer, *Citizen suits in the
environmental field: Peril or promise?*, 2 Ecol L Q
407, 412 (1972).

IV

For these reasons, we conclude that the Court of
Appeals erred when it reversed the trial court's
grant of the defendants' summary disposition mo-
tion. We reverse the decision of the Court of
Appeals, reinstate the trial court's judgment
granting summary disposition in favor of the de-
fendants, and remand to the trial court for a

[38] It is not uncommon for a corporation engaged in conduct causing
environmental contamination to seek protection in bankruptcy court
as a result of clean-up costs required under various statutes and
private litigation seeking money damages for injuries due to the
contamination. In this case, Thomas Solvent Company sought protec-
tion in bankruptcy court in 1984. *In re Thomas Solvent Co,* unpub-
lished opinion of the United States Bankruptcy Court for the Western
District of Michigan, decided April 6, 1984 (Docket No. 84-00843).

[39] Numerous federal and state statutes exist that provide various
remedies for environment damage. See p 317, n 36. One federal
district court rejected a tort claim under the Federal Tort Claims Act
in the face of the plaintiff's argument by analogy to CERCLA, 42 USC
9611. *Charles Burton Builders, Inc v United States,* 768 F Supp 160
(D Md, 1991). The plaintiff, a property owner, had feared damage to
its property from the illegal dumping of hazardous waste in the
vicinity. Because tests showed no injury within the meaning of the
Federal Tort Claims Act, 28 USC 1346(b), summary judgment was
properly granted. The court reasoned that "if reference to CERCLA is
pertinent at all, it tends to support the position that Congress recog-
nized there to be a need for a specific cause of action for 'reaction
expenses' or 'response costs' due to the absence of a right to recover
under the existing law." 768 F Supp 163.

continuation of proceedings with regard to the remaining plaintiffs.

BRICKLEY, GRIFFIN, and MALLETT, JJ., concurred with BOYLE, J.

RILEY, J. (*concurring*). While I agree with the result reached by the majority, I disagree with certain statements made by the majority that suggest that this Court will not hesitate to expand the traditional common-law view or to even abandon such view if it is decided that some policy reason suggests doing so. *Ante,* p 317. I believe that such broad speculation concerning the future treatment by this Court of traditional common-law doctrine is unwarranted.

LEVIN, J. (*dissenting*). Plaintiffs, a group of Battle Creek homeowners, claim that the Thomas Solvent defendants contaminated soil and ground water in the vicinity of their homes through negligent or intentional discharge of toxic chemicals and industrial wastes. The contamination has not reached and will not reach plaintiffs' land. Plaintiffs nevertheless claim that the contamination of neighboring land has adversely affected the value of their homes.

A

The majority holds, as a matter of law, that because "diminution in property values alone constitutes damnum absque injuria,"[1] and the instant plaintiffs, whose land was not contaminated, do not seek to recover damages other than for a reduction in the market value of their homes, plaintiffs may not maintain a nuisance action.

[1] *Ante,* p 310.

Plaintiffs should, in our opinion, be allowed to recover damages in nuisance on proofs introduced at a trial tending to show that the defendants actually contaminated soil and ground water in the neighborhood of plaintiffs' homes with toxic chemicals and industrial wastes, that the market perception of the value of plaintiffs' homes was actually adversely affected by the contamination of the neighborhood, and thus that plaintiffs' loss was causally related to defendants' conduct.

Preservation of property value is, in itself, a legally cognizable interest in this setting, whether any structure on the land is a home or rental[2] or other commercial or industrial property.

A condition, tortiously or intentionally created or maintained on neighboring property, that is a substantial and unreasonable nontrespassory interference with the use and enjoyment of property, may constitute a nuisance.[3] Such a condition may cause personal injury, property damage, or a reduction in the market value of property. The condition may be reflected in a reduction of the market value of a home although no personal injury or other property damage is suffered by the homeowner.

We would hold that a homeowner may maintain a nuisance action to recover damages for a decline in the market value of his home that reflects interference with the use and enjoyment of his home by a condition tortiously created or maintained by the defendant on neighboring property, and that the homeowner may do so without demonstrating interference with use or enjoyment that

[2] The diminution in value of rental property would, absent a long-term lease, be reflected in a reduction of rental income, and thus be more readily and immediately apparent than where the property is not rented.

[3] See 4 Restatement Torts, 2d, §§ 821D, 821F-822, pp 100-102, 105-115; Prosser & Keeton, Torts (5th ed), § 87, pp 622-623.

might result in further, separately compensable
injuries to persons or property.

B

The majority asserts, factually, that "unfounded
fears of third parties,"[4] rather than the conduct of
defendants, were responsible for any reduction in
the value of plaintiffs' property.

In finding as a fact, without a trial on the
merits, that any decline in the value of plaintiffs'
homes was attributable to unfounded fears, the
majority proceeds on the assumption—without re-
quiring defendants to evidentially support, or pro-
viding plaintiffs an opportunity to evidentially
refute that assumption—that none of the reduc-
tion in value was attributable to well-founded
concern about contamination by the defendants of
soil and water supply in the neighborhood.

It appears—contrary to the majority's "un-
founded" fear characterization—that the claimed
reduction in the value of plaintiffs' homes was
attributable *both* to factually well-founded concern
about contamination of the soil and water supply
in the neighborhood, and unfounded concern of
soil and water supply contamination respecting
plaintiffs' homes.

If the majority were to allow plaintiff home-
owners their day in court, plaintiffs might estab-
lish that the claimed decline in the value of their
homes was in fact partly attributable to well-
founded concern of potential buyers about contam-
ination of soil and water supply in the neighbor-
hood, although also in part attributable to un-
founded concern about contamination of the soil
and water supply for plaintiffs' homes.

Even if potential buyers were to be made aware

---

[4] *Ante,* p 316.

that the soil and water supply for plaintiffs' homes is not contaminated, and thus were unfettered by "unfounded fear," they nonetheless would pay no more for plaintiffs' homes than the claimed reduced market value. Thus, to the extent that the value of plaintiffs' homes has declined because of well-founded concern about the contamination of soil and ground water in the neighborhood, educating potential buyers that plaintiffs' homes are not in fact contaminated would not necessarily rectify damage suffered by plaintiffs because of the contamination.

At a trial, defendants would have an opportunity to show, if they can, that any decline in the market value was temporary, and that fully informed buyers later offered to pay prices for plaintiffs' homes that fully rectified any decline in the market value attributable to well-founded concerns that defendants had contaminated soil and ground water in the neighborhood.

C

This does not appear to be a case where the plaintiffs seek to recover damages for a decline in value that is attributable to mass hysteria without any unlawful or tortious misconduct on the part of defendants.

The plaintiffs seek only an opportunity to produce evidence in a court of law tending to show that the negligence or intentional misconduct of the Thomas Solvent defendants did in fact contaminate soil and ground water in the neighborhood and caused plaintiffs economic loss in the form of a decline in the market value of their homes.[5]

_____

[5] Even wholly irrational popular fear, if caused by a condition intentionally or tortiously created by defendants, may justify a damage recovery for a reduction in market value as long as the fear is of

**D**

The general rule is that where there are multiple causes—here, well-founded fears concerning contamination of soil and water supply in the neighborhood and unfounded fears that soil and water supply for plaintiffs' homes were contaminated—the tortfeasor is subject to liability as long as his misconduct is a cause of the decline in market value; it need not be the sole cause of plaintiffs' loss.

It would be to announce an essentially unprecedented but nevertheless somewhat trendy exception[6] to this general rule for this Court to direct that in a nuisance action a jury should apportion damages on the basis of the jury's assessment of the proportions of plaintiffs' loss attributable to well-founded and unfounded perceptions of contamination. But the majority does not even allow the plaintiffs that much.

**I**

The Thomas Solvent defendants[7] owned or operated two sites in Battle Creek where toxic chemicals and industrial wastes were stored.[8] Plaintiffs

a kind experienced by normal persons in plaintiffs' community. See part IV.

[6] See 1986 PA 178, amending the Revised Judicature Act § 2925b (MCL 600.2925b; MSA 27A.2925[2]) concerning the determination of the pro-rata shares of tortfeasors, and to add § 6304 (MCL 600.6304; MSA 27A.6304) providing that in a personal injury action involving fault of more than one party to the action, the percentage of the total fault of each party shall be determined, and for the reallocation of uncollectible amounts.

[7] The complaint originally named as defendants Grand Trunk Western Railroad Corporation and other persons. Rulings and stipulations in the lower courts have left only the Thomas Solvent defendants as parties to this appeal.

[8] The principal place of business of the Thomas Solvent defendants, a facility located on Raymond Road, included a drum storage dock, a

claim that in late 1981 public health officials detected contamination of Battle Creek Municipal water supply wells by toxic chemicals and industrial waste. Similar contaminants were found in private residential wells in the vicinity of defendants' facilities, all involving the same aquifer system.[9]

It does not appear on the record by what means this news was disseminated, whether plaintiffs were told by governmental agencies not to drink well water, or whether plaintiffs were supplied with or obtained bottled water. Plaintiffs argue in this Court that "the neighborhood was told not to drink their water, and bottled water was supplied by government agencies."

During the course of discovery, it became apparent that the property of the twenty-two plaintiffs who are parties to this appeal had not been and never would be contaminated by any toxic substances migrating from defendants' facilities. A feature of the underground landscape known as a hydrogeological divide prevented ground water

warehouse used to store chemicals, and twenty-one underground bulk storage tanks. The Thomas Solvent defendants also leased a facility on Emmett Street, which included a loading dock, two underground bulk storage tanks, and one aboveground tank.

[9] These discoveries allegedly culminated a period of over thirty years during which the Calhoun County Health Department had received numerous complaints concerning the taste, color, odor, and health effects of consumption of water from the vicinity of defendants' facilities. Toxic substances emanating from the sites had allegedly migrated through the aquifer system and contaminated plaintiffs' wells, making the water unsafe to drink and obliging plaintiffs to seek alternative water supplies.

Plaintiffs also alleged that, from 1970 to 1981, the Thomas Solvent defendants were licensed by the Department of Natural Resources to haul liquid industrial waste, that the DNR had initiated administrative proceedings seeking revocation of Thomas Solvent's 1981 license and denial of its 1982 and 1983 license applications, and that the DNR had also denied Thomas Solvent's application for a license to transport hazardous waste under 1979 PA 64, MCL 299.501 et seq.; MSA 13.30(1) et seq. Federal and state investigations of ground water and soil in the vicinity allegedly disclosed high levels of contamination.

flowing from the direction of defendants' property from reaching the property of these plaintiffs.

The Thomas Solvent defendants, claiming that there was no genuine issue of material fact, moved for summary disposition with respect to all claims of the instant plaintiffs, whose properties are located over 2,000 feet south and east of the Thomas Solvent facilities.

Plaintiffs stipulated to dismissal of their claims against defendants except to the extent that plaintiffs claimed damages for reduction in the market value of their homes. Defendants' brief asserts that, by entering into the stipulation, plaintiffs have "abandoned any claims for loss of use and enjoyment of their property," including any right to rely on allegations of altered conduct in response to the publicized contamination.[10]

The circuit court concluded that any reduction in value should be attributed to unfounded public perception of contamination, and not to the claimed conduct of defendants, and dismissed plaintiffs' remaining claims against the Thomas Solvent defendants.

The Court of Appeals reversed and remanded for trial, stating that "[p]laintiffs are not precluded

[10] Plaintiffs' brief characterizes the stipulation as dismissal of "claims in negligence, trespass and strict liability, and for any damages that required that [plaintiffs] be exposed to the chemical contamination."

Alleging negligence, continuing nuisance and trespass, ultrahazardous activities, and that defendants should be held strictly liable, plaintiffs commenced this action, seeking compensation for personal injury and property damage, and injunctive relief to restore the contaminated soil and water to their original condition and to prevent further contamination.

A separate count of the complaint sought recovery for loss of property value due to the migration of hazardous chemicals "to the surrounding area, including the properties owned or occupied by Plaintiffs," allegedly causing such properties "to lose value, to become unsaleable, uninhabitable, and worthless with a loss of the normal use and enjoyment thereof."

from bringing a nuisance cause of action, even assuming that their only damages are a decrease in property values."[11]

## II

The majority acknowledges that "property depreciation is a traditional element of damages in a nuisance action." The majority asserts, however, that "an allegation of property depreciation alone" does not set forth "a cognizable claim in private nuisance of significant interference with the use and enjoyment of a person's property."[12] The majority continues that "[d]iminution in property values caused by negative publicity is, on these facts, damnum absque injuria—a loss without an injury in the legal sense."[13]

## A

In stating that the "issue [is] whether plaintiffs may proceed with their nuisance in fact claims *solely* on the basis of property depreciation due to public concern about contaminants in the general

[11] Reporter's syllabus, 184 Mich App 693; 459 NW2d 22 (1990).

[12] *Ante,* p 314.

[13] *Id.* The majority's invocation of the sonorous Latin expression, damnum absque injuria, puts one in mind of Justice FITZGERALD's early effort in *Rice v Jackson,* 1 Mich App 105, 110; 134 NW2d 366 (1965), quoting a passage from an article on res gestae:

"The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as *'res gestae.'* It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking." [Morgan, *A suggested classification of utterances admissible as* res gestae, 31 Yale L J 229 (1922).]

area,"[14] the majority proceeds on the assumption that this case presents an abstract, desiccated question of law, divorced from actual conditions that may face residents and prospective residents of plaintiffs' neighborhood. This approach likens the instant plaintiffs' claims to the effect of a psychical neutron bomb, that deleteriously affects life in the neighborhood while leaving the physical condition of the property itself eerily untouched.

There is no basis in the record for assuming, without factual support, that the only change caused to plaintiffs' neighborhood by the contamination of property in the area is an attitudinal shift in the community or a statistical shift in the value of homes and other property in the neighborhood.

Were this case to be remanded for trial, it might appear—indeed, it seems far more probable that it would appear—that the character of the neighborhood has changed for the worse. If, as plaintiffs have alleged, the conduct of defendants contaminated soil and ground water in the neighborhood with toxic chemicals and industrial wastes, efforts to "mop up" the contamination might be of limited efficacy, resulting in an unusual number of abandoned, neglected, and otherwise depressed properties in the neighborhood, with inimical effect on the market value of all property in the vicinity.

B

An award of damages for a *reduction in the value of uncontaminated land* was affirmed in *Exxon Corp v Yarema,* 69 Md App 124; 516 A2d 990 (1986). Exxon operated a service station with leaking underground gasoline storage tanks. Contamination reached property owned by *some but*

---

[14] *Ante,* p 316, n 34 (emphasis added).

.

*not all the plaintiffs.* The court held that no rule of law prevented an award of damages simply because there was "no tangible or physical impact on plaintiff's property":

> According to the general view, there must be a substantial interference with the plaintiff's reasonable use and enjoyment of its property. We believe that our conclusion does not violate the established rule that the mere diminution of property value, *absent such tortious interference,* is not sufficient basis for recovery.[15]

The plaintiffs, here as in *Exxon,* complain of "tortious interference."[16]

The Maryland appellate court explained that its

---

[15] 69 Md App 151 (emphasis added).

[16] *Exxon* distinguished *McCaw v Harrison,* 259 SW2d 457, 458 (Ky, 1953), in which "[t]he plaintiffs could sell the property whenever they chose; they were not precluded from building on their land; and they were not prevented from using water from their wells." *Exxon,* 69 Md App 153.

Quoting 10 Am Jur, Cemeteries, § 16, p 498, *McCaw* held that, where there was no actual danger of ground water contamination, the operation of a cemetery would not be enjoined as a nuisance "merely because it is a constant reminder of death .and has a depressing influence on the minds of persons who observe it, *or because it tends to depreciate the value of property in the neighborhood,* or is offensive to the aesthetic sense of an adjoining proprietor." (Emphasis added.)

The majority cites *McCaw* for the proposition that property depreciation caused by unfounded fears does not constitute a nuisance, *ante,* p 29, n 29. In addition to the analysis offered by the Maryland appellate court, *McCaw* is distinguishable from the instant case on other grounds. First, *McCaw* involved denial of *injunctive* relief (see subpart c). Second, it followed the almost universal rule against characterization of *cemeteries* as nuisances. See 14 Am Jur 2d, Cemeteries, § 12, pp 714-715. Finally, the case was decided under Kentucky law, which is peculiarly resistant to nuisance claims of this kind. Kentucky, unlike Michigan, is one of the few jurisdictions refusing to enjoin as a private nuisance the operation of a funeral home in a residential district. See *L D Pearson & Son v Bonnie,* 209 Ky 307; 272 SW 375; 8 ALR4th 324, 335 (1925), holding that potential depreciation and "sentimental" aversion to mortuaries did not amount to a substantial and material interference with the use and enjoyment of neighboring property. Cf. anno: *Funeral home as private nuisance,* 8 ALR4th 324, discussed in n 64. .

holding "does not mean that plaintiffs may recover for diminution of property value without proof of harm to their property but rather that *harm to property should be construed broadly to include intangible tortious interferences*" with the use and enjoyment thereof.[17] The court observed that

> Exxon has interfered with [the plaintiffs'] use and enjoyment of their land. *Gasoline contamination of ground water imposed crippling restrictions not only on the contaminated land but on all the property adjacent to that land.* The Baltimore County Health Department forbade plaintiffs from using their ground water, building houses on their land or selling the land even at a reduced price. *These are injuries for which the plaintiffs are entitled to recover if the jury believed that they were caused by Exxon's tortious interference with their property rights.* The fact that the reputation of the plaintiffs' land is inextricably interwoven in the assessment of damages is not reason to avoid an award.[18]

*The instant plaintiffs similarly allege that they were told not to drink their well water and were unable to sell their property* after adverse information was disseminated through governmental agencies.

Plaintiffs do not allege that the sale of their property was prohibited outright. Were this case remanded for trial, however, plaintiffs might be able to show that they have been unable to sell their property at any but a significantly reduced, ·

---

[17] 69 Md App 152 (emphasis added).

The court's construction of "harm to property" comports with the Restatement view of private nuisance as a "nontrespassory invasion of another's *interest* in the private use and enjoyment of land." 4 Restatement Torts, 2d, ch 40 (Nuisance), § 821D, p 100 (emphasis added). See comment b, p 101, and also ch 1 (Definitions), § 1, pp 2-4, which broadly defines "interest."

[18] *Id.,* p 153 (emphasis added).

or a ruinously low, price.[19] "These are injuries for which the plaintiffs are entitled to recover if the jury believe[s] that they were caused by [the defendant's] tortious interference with their property rights."[20]

The majority distinguishes *Exxon* on the ground that the instant case presents "no claim of contaminated well water or the preclusion of sale. This case comes to us *singularly* on the issue whether plaintiffs may proceed with their nuisance in fact claims *solely* on the basis of property depreciation due to public concern about contaminants in the general area."[21]

The majority misapprehends plaintiffs' remaining claim for relief as a bare assertion that popular fears of contamination should subject defendants to liability for property depreciation. The complaint sought compensation for personal injury and property damage.[22]

Plaintiffs' *factual allegations* are broader than their remaining *claim* for a specific element of damages. They have alleged a range of facts amounting to an interference with interests in the use and enjoyment of property beyond "mere" reduction in the market value of their homes.[23]

[19] Although plaintiffs do not allege that they were prevented from building on their land, it might appear at trial that plaintiffs have been unable to secure financing for construction, or may have found construction untenable because of the depressed market for their property.

[20] *Exxon,* 69 Md App 153.

[21] *Ante,* p 316, n 34 (emphasis added).

[22] See n 10.

[23] The parties dispute the status, before this Court, of allegations that plaintiffs were subjected to interference with particular interests in the use and enjoyment of property other than property depreciation. Such interferences may include contamination of municipal or private well water, and plaintiffs' adoption of alternative water supplies in response to the contamination of the neighborhood. See text following n 18.

Plaintiffs argue that the stipulation striking other *elements of*

Such indicia of interference with use and enjoy-
ment remain relevant to the question whether
property depreciation was caused by defendants'
conduct, and to the broader question whether
defendants' conduct substantially interfered with
plaintiffs' interests in the use and enjoyment of
property.

Although plaintiffs have stipulated to relinquish
the right to seek damages for interference with
their use and enjoyment of property in forms
distinct from depreciation, the disposition of this
case should not depend on whether they so stipu-
lated rather than continuing to insist on seeking
to recover damages for personal injury as well as
for a decline in market value. To rely on plaintiffs'
decision not further to seek damages for personal
injury, a narrow point without legal foundation
until today's decision, reduces the jurisprudential
significance of this case to a hypertechnicality, and
encourages parties generally to give no quarter in
litigation, lest the trial or an appellate court find
against the stipulating party on a hypertechnical-
ity.

C

According to the majority, "[t]his Court has held
that property depreciation alone is insufficient to
constitute a nuisance."[24]

---

*damages* "does not mean that the facts leading up to the tort can not
be entered into evidence, and indeed, such facts would be presented to
a jury to support the reasons for the property being devalued."

The majority asserts that plaintiffs' allegations regarding "contami-
nation of municipal water . . . are not properly before us since the
plaintiffs failed to appeal from the trial court's order denying leave to
amend their complaint" to reflect such claims. *Ante,* p 301, n 4. In
their complaint, however, plaintiffs alleged facts tending to support
the conclusion that defendants' conduct had led to contamination of
municipal well water.

[24] *Ante,* p 311, citing *Warren Twp School Dist v Detroit,* 308 Mich

The majority relies largely on decisions of this Court denying *injunctive relief* to plaintiffs who claimed that the establishment or maintenance of a business would constitute a nuisance. This Court, in *Warren Twp School Dist v Detroit,* 308 Mich 460; 14 NW2d 134 (1944), and *Plassey v S Loewenstein & Son,* 330 Mich 525; 48 NW2d 126 (1951), held that the *potential* for property depreciation, without more, does not justify *enjoining* the *establishment* of a *lawful business* on neighboring property.[25]

Plaintiffs here, in contrast, assert a *damage* claim for *actual,* not potential, diminution of value, arising out of defendants' *past,* allegedly *unlawful* activity.

In *Warren Twp,* the plaintiffs sought to prevent condemnation of a site for a proposed airport. In declining to enjoin condemnation to preclude potential damage to the plaintiffs' property, the Court said that the plaintiffs *would have* a cause of action for damages "if conditions they now claim are threatened should hereafter arise."[26]

In *Plassey,* the Court reaffirmed the rule that equity " 'will not interfere *in advance of the creation of a nuisance* where the *injury is doubtful or contingent,* and anticipated merely from the use to which the property is to be put.' "[27] The conduct

---

460, 469-470; 14 NW2d 134 (1944), *Plassey v S Loewenstein & Son,* 330 Mich 525, 530; 48 NW2d 126 (1951), and *Garfield Twp v Young,* 348 Mich 337; 82 NW2d 876 (1957).

At *ante,* p 312, n 28, the majority also cites *Henkel v Detroit,* 49 Mich 249; 13 NW 611 (1882), discussed in n 53.

[25] *Garfield Twp v Young,* n 24 *supra,* extends the *Plassey* holding to a business already in operation. *Warren Twp* was cited by *Plassey,* which in turn is the sole authority for the relevant passage of *Garfield Twp.*

[26] *Id.,* p 466. The Court affirmed dismissal of the complaints "without prejudice to the rights of plaintiffs . . . to seek *injunctive or other relief* should the airport be built and its operation . . . result in a nuisance or continuing trespass." *Id.,* p 479 (emphasis added).

[27] *Plassey,* 330 Mich 529, quoting *Briggs v Grand Rapids,* 261 Mich

complained of in the instant case—intentional, negligent, or accidental discharge of toxic chemicals and industrial wastes—was not, in contrast with the slaughterhouse and rendering plant at issue in *Plassey,* a "lawful business" free from violations of "applicable law."[28]

D

Decisions denying injunctive relief in nuisance cases do not necessarily justify dismissal of an action for damages, because a judgment denying injunctive relief may turn on application of rules relating to equitable remedies.

The usual rule of equity applies to the instant plaintiffs' claim for property depreciation; before an injunction will issue,

> there must be such an injury as from its nature is *not susceptible of being adequately compensated by damages at law,* or such as from its continuance or permanent mischief must occasion a constantly recurring grievance, which cannot be otherwise prevented but by an injunction. . . . So a mere diminution of the value of property by the nuisance without irreparable mischief will not

11, 15; 245 NW 555 (1932) (emphasis added). *Plassey* dealt with efforts to enjoin as a nuisance the proposed construction of a slaughterhouse and rendering plant.

The Court noted, however, that if a proposed use of neighboring land "would unquestionably result in a nuisance affecting the rights of individuals," a cause of action in private nuisance would accrue, potentially justifying an injunction. *Id.,* p 530.

[28] The Court observed:

> [I]n *the absence of violation of applicable law* or restrictions, one may construct on his property a building in which to carry on a *lawful business,* and the mere fact that doing so *may* lessen the value of other property in the locality does not constitute the erection of the building a nuisance. [*Id.* Emphasis added.]

See part III.

furnish any foundation for *equitable* relief. [2 Story, Equity Jurisprudence, § 1253, p 602 (14th ed, 1918). Emphasis added.]

This Court has recognized that refusal to enjoin a lawful business as a nuisance does not preclude a damage recovery for property depreciation, stating that "[a]s to such injury, if any, *complainants have an adequate remedy at law*." *Ballentine v Webb,* 84 Mich 38, 45; 47 NW 485; 13 LRA 321 (1890) (emphasis added).[29]

Decisions *granting* injunctive relief against an alleged prospective nuisance, however, generally *support* damage awards in factual settings in which the harm has already occurred, because an injunction will not issue absent evidence of a significant interference with the use and enjoyment of property.[30]

---

[29] The United States Supreme Court has held that damages are recoverable although the plaintiff is unable to demonstrate that a particular private nuisance justifies issuance of an injunction. See *Parker v Winnipiseogee Lake Cotton & Woollen Co,* 67 US 545, 551; 17 L Ed 333 (1862). Courts of other jurisdictions have acted on this principle by permitting actions for damages to proceed in factual situations not justifying injunctive relief. See, e.g., *Lyons v McKay,* 313 P2d 527, 528-529 (Okla, 1957); *King v Columbian Carbon Co,* 152 F2d 636, 641-642 (CA 5, 1945) (applying Texas law); *Ruggiero v Lockstrip Mfg Corp,* 254 AD 783; 4 NYS2d 824 (1938); *De Blois v Bowers,* 44 F2d 621, 624 (D Mass, 1930); *Haggart v Stehlin,* 137 Ind 43, 55-56; 35 NE 997 (1893).

See also *Conway v Gampel,* 235 Mich 511, 514; 209 NW 562 (1926), similarly acknowledging the propriety of a damage remedy as an alternative to injunctive relief in a private nuisance action involving property depreciation; *Rohan v Detroit Racing Ass'n,* 314 Mich 326, 360-361; 22 NW2d 433 (1946) (a court of equity will abate nuisance " 'only in cases where an action at law would afford no adequate redress' ") (quoting *Adams v Kalamazoo Ice & Fuel Co,* 245 Mich 261; 222 NW 86 [1928]); *Turner v Hart,* 71 Mich 128, 139; 38 NW 890 (1888) ("It is not always a matter of course to grant relief in [private nuisance] cases, in a court of equity, when the law side of the court is open for legal redress").

[30] In affirming a damage award for depreciation of uncontaminated land, the court in *Exxon* cited actions for injunction as precedent. The defendant sought to distinguish such cases, but the court asserted that nuisance claims for injunctions and damages were analyzed

E

The Second Restatement of Torts explains that "[a] potent cause of confusion" in private nuisance is the citation of cases in equity "as precedents in actions at law without regard to their differences." The Restatement observes that "[C]onsiderations *enter into the determination of the right to an injunction that are inapplicable or have less weight in determining the right to damages*":

An injunction may be obtained in a proper case against a threatened private nuisance, but an action cannot be maintained at law unless harm already has been suffered. *Even when there is present harm, it is one thing to say that a defendant should pay damages for the harm his factory is causing but it is a different thing to say that he must close his factory if the harm cannot be stopped.*[31]

under the same standard, differing only with respect to adequacy of the remedy. 69 Md App 151, n 5.

The Court of Appeals in the instant case distinguished *Smith v Western Wayne Co Conservation Ass'n,* 380 Mich 526, 543; 158 NW2d 463 (1968) (see Appendix, part A), on the ground that *Smith* involved an injunction. The majority, citing *Exxon,* p 151, n 5, rejects this distinction as a "non sequitur," apparently concluding that the remedy sought is not material to the question "whether an action *in damage* for nuisance in fact can be predicated upon unfounded fears of ground water contamination." *Ante,* p 312, n 27 (emphasis added). While the proposition expressed in n 5 of *Exxon* is correct as applied to *Exxon* itself, it is overbroad if applied to demolish the distinction between *Smith* and the instant case.

31 4 Restatement Torts, 2d, § 822, comment d, p 111 (emphasis added).

In sum, "*denial of relief by way of injunction is not always a precedent for denial of relief by way of damages.* Consequently, liability for damages should be treated independently . . . ." *Id.*

The Restatement notes that in damage actions,

an invasion may be regarded as unreasonable even though the utility of the conduct is great and the amount of harm is relatively small. . . . *But for the purpose of determining whether the conduct producing the invasion should be enjoined,* additional factors must be considered. *It may be reasonable to*

An order enjoining operation of a lawful business, unlike the damage remedy, is not generally available unless the gravity of the harm to the plaintiff outweighs the utility of the defendant's conduct.[32]

The majority acknowledges these considerations, but disposes of them by stating that, "[i]n both law and equity, . . . unfounded fears cannot constitute an allegation of a nuisance in fact with regard to these plaintiffs."[33] Rules of law that modulate outcomes in equitable and legal actions are not, however, rendered inoperative simply because fears, either factually founded or unfounded, are involved.

### F

*Warren Twp* and similar cases[34] hold that where the plaintiff *failed* to establish that the *proposed* operation of an *airport* would constitute a *nui-*

> continue an *important activity if payment is made for the harm it is causing but unreasonable to initiate or continue it without paying.* [*Id.* Emphasis added.]

Accordingly, damages may also be available if the defendant's use of property is negligent or otherwise unlawful, as plaintiffs here allege.

[32] See, generally, *id.,* §§ 826-828, pp 119-133.

*Gunther v E I DuPont de Nemours & Co,* 157 F Supp 25 (ND W Va, 1957) (see Appendix, part B), cited by the majority at *ante,* pp 310-311, illustrates this principle. Even if the plaintiffs in that case had offered evidence "sufficient in law to show that a nuisance does exist," the court concluded, "it does not necessarily follow that an injunction order, abating the nuisance, must be issued." 157 F Supp 33. Stressing the economic importance to the defendant, and to the entire community, of continued testing, *id.,* pp 27, 34, the court explained that the "comparative hardship" to the defendant outweighed any inconvenience the Gunthers could adduce. *Id.,* p 33.

[33] *Ante,* p 315.

[34] The portion of *Warren Twp* cited by the majority, pp 469-470, adverts to *Batcheller v Commonwealth,* 176 Va 109; 10 SE2d 529 (1940), quoting in part from *Thrasher v City of Atlanta,* 178 Ga 514; 173 SE 117; 99 ALR 158 (1934), and *Swetland v Curtiss Airports Corp,* 41 F2d 929 (ND Ohio, 1930).

*sance per se,* the court will not *enjoin construction* merely on a showing that airport operation may reduce the value of neighboring property.[35]

The business at issue in these cases, unlike defendants' conduct in the instant case, was not only "lawful," but was regarded as an essential public service. All the cases relied on by *Warren Twp* characterize aviation as crucial to modern

---

[35] The majority states that because courts have traditionally eschewed harsh curtailment of productive activity on private property and did not accord "de minimis annoyances" the status of legally compensable injuries, "courts frequently concluded that diminution in property values alone constitutes damnum absque injuria." *Ante,* p 310.

Plaintiffs' claim for relief cannot be so characterized. Although the majority repeatedly intones "damnum absque injuria" as if it were the irrefragable conclusion of a legal syllogism, it appears as a free-floating conclusion of law, expressing assumption of the very issue to be decided. Thus, neither this "rule" nor the authorities cited by the majority justify denial of relief.

Judicial opinions that have characterized property depreciation as damnum absque injuria have generally predicated the holding on the absence of nuisance. See, e.g., *Grand Rapids & Indiana R Co v Heisel,* 38 Mich 62; 31 Am Rep 306 (1878), cited by the majority *ante,* p 309, n 22 (because the plaintiff lacked proprietary rights in the street, the mere placing of railroad tracks, an activity in furtherance of a lawful business and not a nuisance in itself, was damnum absque injuria with regard to her insofar as it affected only the value of her property; noise or other legal grievances constituted actionable nuisance to the extent they resulted from improper conduct of the railroad, although property depreciation was an inappropriate measure of damages, because the harm suffered was not permanent); *Winget v Winn-Dixie Stores, Inc,* 242 SC 152, 159-162; 130 SE2d 363 (1963), cited by the majority *ante,* p 311, n 25 (an action for damages arising out of the operation of a supermarket on the edge of the plaintiffs' residential neighborhood; because the establishment was "a lawful one" and was sited in an appropriately zoned district, location alone could not make it a nuisance, but property depreciation arising out of *operation* of the business was compensable where the interferences with the plaintiffs' rights were "not normal or necessary incidents of" operation); *Bader v Iowa Metropolitan Sewer Co,* 178 NW2d 305, 307 (Iowa, 1970), cited by the majority *ante,* p 310, n 24, where the court refused to enjoin a sewage treatment lagoon and stated that a "lawful use" of property that does not create a public or private nuisance (the "[p]laintiff's evidence of a nuisance resulting from odors emitting from the lagoons was not satisfactory") "cannot be enjoined because of, or damages recovered for, the diminution in value of neighboring properties resulting therefrom."

commercial development. All devote considerable attention to public policy pronouncements, stressing the need for expanded air-travel capacity, lest the community fall behind the times.

Protecting polluters of the water supply against the consequences of their conduct is not, in contrast with facilitating airport development and operation, an interest deserving of judicial indulgence.

G

Where the plaintiff's primary claim of loss is property depreciation, courts have traditionally been reluctant to enjoin the operation of a lawful business as a nuisance. This reluctance derived in large measure from recognition of the adequacy and appropriateness of the *damage* remedy.[36] Where the plaintiff complains of property depreciation, rather than other interferences with the use and enjoyment of property, damages are readily ascertainable and suffice to make the plaintiff whole.[37]

The law of nuisance has recognized that property depreciation, in itself, may constitute an interference with an interest in the use and enjoy-

[36] *Conway v Gampel,* n 29 *supra; Ballentine v Webb,* text accompanying n 29.

[37] As the majority observes, the court in *Bader,* n 35 *supra,* stated that "absent a nuisance, a 'use cannot be *enjoined because of, or damages recovered for,* the diminution in value of neighboring properties resulting therefrom.' " *Ante,* p 310, n 24 (emphasis added). The court characterized such property depreciation as damnum absque injuria.

In making this assertion, however, the court in *Bader* invoked *Gunther,* and cited other authorities rendering similar holdings relating to *enjoining* a lawful business. In modern nuisance actions, the phrase damnum absque injuria, which, in the majority's words, means "a loss without an injury in the legal sense," *ante,* p 314, is almost invariably invoked in cases involving requests for *injunctive* relief.

ment of property.[38] In *Conway v Gampel,* 235 Mich
511, 514; 209 NW 562 (1926), this Court affirmed
an injunction against operation of a slaughter-
house in a residential neighborhood, and said:

> There is evidence that the claimed nuisance has
> *depreciated the value* of the property of some of
> the plaintiffs. For this element alone there may be
> an adequate remedy at law. (*Ballentine v Webb,* 84
> Mich 38 [13 LRA 321]), but *the evidence may be
> considered as regards the fact of nuisance.* [Em-
> phasis added; citations omitted.][39]

As the majority's historical survey suggests, the
remedy of *damages for property depreciation* is at
the core of the nuisance action;[40] only compara-
tively recently have courts recognized other inter-
ferences with use and enjoyment, including annoy-
ance and discomfort, as separately compensable in
damages.

Injuries to property value and to a plaintiff's
peace of mind are aspects of the same general kind
of harm in nuisance actions; both flow from the
relationship of a plaintiff to the land.[41] Damages

---

[38] "*The substantial interference requirement is to satisfy the
need for a showing that the land is reduced in value* because of
the defendant's conduct . . . ." [Prosser & Keeton, Torts (5th
ed), § 87, p 622, quoted by the majority, *ante,* p 305. Emphasis
added.]

[39] The Court thus cited *Ballentine* for the proposition that property
depreciation was compensable at law in a nuisance action even where
equitable relief was unavailable.

[40] *Ante,* p 307.

[41] This does not mean that interferences with other interests in the
use and enjoyment of property are peripheral or unimportant, but
does refute the majority's insistence that plaintiffs must seek to
recover damages for an interference beyond property depreciation.

According to 4 Restatement Torts, 2d, § 821D, comment b, p 101,
the "[i]nterest in use and enjoyment" encompasses "freedom from
annoyance and discomfort," which is distinct not only from "freedom
from detrimental change in the physical condition of the land itself,"

for property depreciation may be awarded separately from damages for other interferences with interests in the use and enjoyment of the affected property, even where the factual predicates for both types of damages are closely related.[42]

### III

After repeatedly adverting to the business of the instant defendants as "lawful,"[43] the majority states: "[T]he fact that *violations of the law may have occurred on the* [*defendants'*] *property* does not make the conduct of the business a *nuisance in fact.* Indeed, *Garfield Twp* [*v Young,* 348 Mich 337; 82 NW2d 876 (1957),] rejects the precise argument upon which the dissent relies."[44]

*Garfield Twp* held that operation of an otherwise lawfully conducted junkyard could not be *enjoined* as a *nuisance per se* merely because the owner had flouted a local ordinance requiring that such businesses be licensed.[45] Similarly, *Village of St Johns v McFarlan,* 33 Mich 72; 20 Am Rep 671 (1875), on which this Court largely relied in *Garfield,* and which the majority quotes in support of the broad proposition that "illegal conduct alone [is] not

but *also* from the *personalty* "interest in freedom from emotional distress." Freedom from discomfort and annoyance *"is essentially an interest in the usability of land and, although it involves an element of personal tastes and sensibilities, it receives much greater legal protection."* (Emphasis added.)

[42] See, e.g., *Spencer Creek Pollution Control Ass'n v Organic Fertilizer Co,* 264 Or 557; 505 P2d 919 (1973); *Padilla v Lawrence,* 101 NM 556; 685 P2d 964 (1984); *Widmer v Fretti,* 95 Ohio App 7; 116 NE2d 728 (1952); *Miller v Carnation Co,* 39 Colo App 1; 564 P2d 127 (1977).

[43] See e.g., *ante,* p 314.

[44] *Ante,* p 314 (emphasis added).

[45] 348 Mich 340-341. The Court rejected the township's claim that "the resolution regulates a business affecting public health, welfare and morals, and therefore its violation is a nuisance per se." *Id.,* p 340.

enough" to "prove nuisance,"[46] held that "a court in chancery" had "no jurisdiction to *restrain* the *threatened violation* of a *village ordinance,* unless the act threatened to be done, if carried out, would be a nuisance."[47]

Such holdings do not suggest that as long as the "[d]efendant's business is a lawful business,"[48] as distinct, presumably, from a brothel or gambling casino, which might be a public nuisance per se, defendant's unlawful use of land is of no consequence in determining whether a plaintiff may recover damages in nuisance.[49]

Rather, as set forth in the Second Restatement formulation, because recovery for unintentional nuisance may be *predicated* on a showing that the defendant's conduct is independently actionable in tort:

> [A]n actor is subject to liability for private nuisance for a nontrespassory invasion of another's interest in the private use and enjoyment of land if . . . the invasion is *either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct.*[50]

Plaintiffs in the instant case have alleged that defendants' discharge of toxic chemicals and hazardous waste, even if unintentional, was "otherwise actionable under the rules governing liability

[46] *Ante,* p 314, n 31.

[47] 33 Mich 73 (emphasis added).

[48] *Ante,* p 314.

[49] *Id.*

The instant plaintiffs have alleged that defendants' use of their facilities violated applicable laws regulating the storage and shipment of hazardous waste. Such violations of law are not comparable with the violations of licensing and zoning ordinances discussed in *Garfield Twp.*

[50] *Ante,* p 304 (emphasis added).

for negligent, reckless, or ultrahazardous conduct."
In contrast, violation of the local ordinance in-
volved in *Garfield Twp* was not "otherwise action-
able" by a private party claiming to be aggrieved
thereby, because "a penalty, only, [was] imposed
for failure to comply with its provisions."[51]

This Court has also recognized not only that
violations of "applicable law or restrictions" may
be pertinent to a finding of nuisance, but that even
in the absence of such a violation a lawful busi-
ness may be enjoined as a nuisance if circum-
stances otherwise warrant.[52]

The majority's other references to cases involv-
ing claimed property depreciation in the context of
siting of business operations cast no light on the
instant case.[53]

---

[51] 348 Mich 340.

[52] In *Plassey,* cited by the majority at 311-312, the Court declined to
enjoin a lawful business as a nuisance "in the absence of violation of
applicable law or restrictions . . . ." 330 Mich 530.

In *Rockenbach v Apostle,* 330 Mich 338, 344; 47 NW2d 636 (1951),
the Court held that an ordinance allowing the maintenance of a
funeral home in a district zoned for residential or commercial pur-
poses "is permissive only, and not controlling as to whether [the]
establishment would constitute a nuisance which might be enjoined
by an equity court. . . . A nuisance will not be upheld solely on the
ground that it has been permitted by municipal ordinance." (Citations
omitted.)

[53] The majority cites *Henkel v Detroit,* n 24 *supra,* as follows:
"[E]ven if the value of property was diminished by the city's market
regulations that increased market wagons and traffic to the detriment
of the plaintiff's property value, the complainant has suffered no
compensable injury." *Ante,* p 312, n 28.

In *Henkel,* this Court denied both injunctive relief and damages for
property depreciation when customers' access to the plaintiff's pork
packing business was impeded by the expansion of a public market.
The plaintiff had "come to the nuisance" by establishing his business
on the site in the knowledge of its use for the market. The Court
enumerated the public benefits derived from operation of the market,
which was situated and conducted pursuant to validly enacted city
regulations, and concluded:

Every person is supposed to calculate upon the probability of
his interests being affected by such matters when he buys his

IV

Similarly unpersuasive is the majority's statement adverting to an unrelated passage of the dissent as follows:

[W]e would think it not only "odd," but anachronistic that a claim of nuisance in fact could be based on unfounded fears regarding persons with AIDS moving into a neighborhood, the establishment of otherwise lawful group homes for the disabled, or unrelated persons living together, merely because the fears experienced by third parties would cause a decline in property values.[54]

The "conditions" on adjoining property enumer-

property or locates his business, and he gains or loses according as his judgment is verified or is disproved by events. . . . What the city has done it has the discretion to do, and we find no abuse of discretion made out. The whole matter is one of market regulation[,] and we could not, if we would, supervise the municipal action. [*Henkel,* 49 Mich 261-262. Citations omitted.]

Ground water contamination is not "market regulation." The instant plaintiffs should not be deprived of a damage remedy for property depreciation triggered by defendant's allegedly unauthorized acts on the theory that all property owners are "supposed to calculate upon the probability of [their] interests being affected" by unlawful discharge of toxic chemicals and hazardous waste on nearby property. *Id.*

The old English decisions discussed *ante,* p 309, n 21, such as the *Gloucester Grammar School Case,* YB 11 Hy IV, Mich, pl 21 (1409), found no *injuria* and denied recovery for lost income when neighboring properties were given over to the establishment of businesses competing directly with those of the plaintiffs. These cases establish nothing more than that the operation of a business on neighboring property cannot be held to be a nuisance simply because it competes with the business on the plaintiff's property.

See also *McMorran v Fitzgerald,* 106 Mich 649, 652; 64 NW 569 (1895), cited by the majority at 310, in which this Court enjoined operation of a boat repair business in a residential neighborhood. The Court observed that the defendants "*could look at the matter only from the standpoint of business, to which all other interests should yield,—a sentiment which is not uncommon, but one which the law does not sanction.*" *Id.,* p 653 (emphasis added).

54 *Ante,* p 316.

ated by the majority are not only "lawful," but may be accorded special legal protection on constitutional or statutory grounds.[55] No constitutional or statutory protection attaches to the condition the instant defendants are alleged to have created or maintained on their property.

To the extent that the majority's illustration has any bearing at all on the instant case, it is contrary to the principle that an interference with use and enjoyment of property will not constitute actionable nuisance unless it affects

> the ordinary comfort of human existence *as understood by the American people in their present state of enlightenment.* The theories and dogmas of scientific men, *though provable by scientific reference, cannot be held to be controlling unless shared by the people generally.* [*Everett v Paschall,* 61 Wash 47, 52; 111 P 879; 31 LRA (NS) 827 (1910). Emphasis added, citations omitted.]

Although it would undoubtedly be considered "anachronistic" to enjoin the placement of a woman with leprosy in a residential district in 1992, the public understanding, or misunderstanding, of leprosy in 1898 justified such action.[56] The court reaching that conclusion expatiated on

> the popular belief of [leprosy's] perils founded on the Biblical narrative, on the stringent provisions of the Mosaic law that show how dreadful were its ravages and how great the terror which it excited, and an almost universal sentiment, the result of a common concurrence of thought for centuries,

[55] See *City of Cleburne, Texas v Cleburne Living Center,* 473 US 432; 105 S Ct 3249; 87 L Ed 2d 313 (1985); *Moore v East Cleveland,* 431 US 494; 97 S Ct 1932; 52 L Ed 2d 531 (1977).

[56] *Baltimore v Fairfield Improvement Co,* 87 Md 352; 39 A 1081; 40 LRA 494 (1898), discussed in n 79.

[that] cannot in this day be shaken or dispelled by mere scientific asseveration or conjecture.[57]

If equally overpowering fears now grip the public with regard to toxic waste, radioactive contamination, or similar modern perils, this Court may not properly dismiss such fears out of hand.

V

The majority's analysis implicitly assumes that resolution of this case is governed by the doctrine that mere apprehension of injury, based on an unfounded perception of danger, is not actionable in tort. In general, this proposition is indisputable as applied to the wholly unreasonable fears of a plaintiff. However, even fears without factual foundation may permit of recovery in nuisance if the fears are of a kind to be expected from a normal member of the affected community.[58]

Further, the instant case does not present a claim based on plaintiffs' own apprehension of injury or perception of danger. Plaintiffs assert, rather, that the normal fears of potential buyers, both factually founded and unfounded, precipitated a decline in the value of plaintiffs' property.

A

The majority declares:

Diminution in property values caused by negative publicity is, on these facts, damnum absque injuria—a loss without an injury in the legal sense.[59]

---

[57] 87 Md 365.

[58] See 4 Restatement Torts, 2d, § 821F, comment f, p 107, set forth in n 102 and accompanying text.

[59] *Ante,* p 314.

Fear-inspired property depreciation will support a nuisance action where (a) the fears are such as would ordinarily be experienced by a person confronting the activity conducted, or the condition created or maintained, on neighboring property,[60] and (b) competent evidence establishes that the fears manifested themselves in a decline in the value of plaintiffs' property.

*Rockenbach v Apostle,* 330 Mich 338; 47 NW2d 636 (1951),[61] concerned the proposed operation of a funeral home in a residential district. The plaintiffs, neighboring homeowners, sought to enjoin establishment of the business as a nuisance. The Court, finding that the mortuary "would have a depressing influence upon [the plaintiffs],"[62] and that potential purchasers of the plaintiffs' property would likely react the same way,[63] granted an injunction.[64] The Court concluded that the *fear or dread* evoked by the proximity of a mortuary—

---

[60] See 4 Restatement Torts, 2d, § 821F, comment f, p 107, n 102, addressing "[n]ormal mental reactions." In this setting, the relevant fears are experienced by the community at large rather than the plaintiffs.

[61] *Rockenbach* relied on *Saier v Joy,* 198 Mich 295; 164 NW 507 (1917), *Dillon v Moran,* 237 Mich 130; 211 NW 67 (1926), and *Kundinger v Bagnasco,* 298 Mich 15; 298 NW 386 (1941).

These cases concerned actions for injunctive relief, and demonstrate that evidence of property depreciation may support a nuisance action even in equity.

[62] *Id.,* p 344.

[63] [P]roperty values would be substantially depressed for residential purposes by the proposed establishment of the funeral home. [*Id.,* p 346.]

[64] This decision is in accord with the clear majority rule among the States. See anno: *Funeral home as private nuisance,* 8 ALR4th 324, 328.

Courts addressing anticipated psychic effects of nearby businesses have not always sharply distinguished the apprehensions of the plaintiffs from the apprehensions of other persons forming a potential market for residential property in the neighborhood. The focus on market value, however, manifests judicial recognition that property depreciation, if proved, supports a cause of action in nuisance on these facts.

" 'not well founded, as we have seen, but nevertheless present in the mind of the normal layman' "—tended to have an adverse effect on market values.[65]

In *Dillon v Moran,* 237 Mich 130, 131; 211 NW 67 (1926), this Court enjoined as a nuisance the proposed establishment of a funeral home in a residential district *on the sole ground that "plaintiff would suffer material pecuniary loss"* if defendant's plans were carried out. (Emphasis added.) The plaintiff's property was adjacent to the proposed site. The Court cited no interference with an interest in the use and enjoyment of property, and no inconvenience that might be suffered by the plaintiff, except "pecuniary loss."[66]

*Dillon* makes clear that "diminution in property values alone" is not always "damnum absque injuria,"[67] and the absence of other interferences with the use and enjoyment of property does not automatically preclude maintenance of a nuisance action.[68] Similarly, *Rockenbach* echoed *Kundinger v Bagnasco,* 298 Mich 15; 298 NW 386 (1941), in stressing that, to recover in nuisance, plaintiffs need not demonstrate that they were threatened by a traditionally recognized intrusion on their enjoyment of land, such as offensive odors:

---

[65] *Rockenbach,* 330 Mich 349, quoting *Saier v Joy,* 198 Mich 300 (emphasis added).

[66] See also *Kundinger v Bagnasco,* n 61 *supra,* similarly emphasizing the effect of unfounded fears on the use and enjoyment of property, and holding that "[*i*]*t is not necessary to show danger from disease or unpleasantness of odors* arising from the maintenance of such a business in order to enjoin it." *Rockenbach,* 330 Mich 349-350 (emphasis added).

[67] *Ante,* p 310.

[68] The dispute in *Dillon* concerned the character of the neighborhood. "In the main, defendant's testimony was directed towards combating the plaintiff's claim that the district is a residential one." 237 Mich 131. This Court's determination that the neighborhood was indeed residential, *id.,* p 132, was essential to the grant of injunctive relief.

> The evidence in this case *would not support a finding that the establishment proposed by the defendants will in its operation become a nuisance by reason of noises, odors, fumes, flies, or dissemination of disease.* In fact, plaintiffs have abandoned such claims, and there is no probative value in any testimony to show that a parking problem or traffic congestion will necessarily arise.[69]

It is odd to assert that although relief is available against a defendant conducting a lawful business and committing no independently actionable wrong, it is unavailable where plaintiffs' allegations, if proved, render defendants at least subject to liability to numerous property owners in plaintiffs' immediate neighborhood.

Further, if the proposed establishment of a lawful business may be enjoined as a nuisance in fact, a damage remedy should be available to compensate for pecuniary harm already suffered as the result of unlawful or tortious conduct.

### B

This Court has on other occasions held that the prospect of residential property depreciation, even when based on the unfounded fears of the community constituting the market for such property, is

---

[69] *Rockenbach*, 330 Mich 352, distinguishing, inter alia, *Warren Twp* (emphasis added).

The majority asserts that such cases "do not establish that property depreciation on the basis of unfounded fear of third parties makes out a compensable allegation of nuisance in fact. Indeed, *Kundinger* . . . itself points to the need to show invasion of a legally cognizable interest," such as emotional distress. *Ante,* p 315, n 32.

The preservation of property value is itself a "legally cognizable interest" protected against unreasonable interference by the law of nuisance. The instant plaintiffs need not have "allege[d] an increased risk of illness, threat to safety, or lack of a habitable dwelling caused by contaminants released by the defendants," *ante,* p 318, to recover in nuisance for diminution of property value.

evidence of a threatened nuisance and supports an injunction.

In *Birchard v Lansing Bd of Health,* 204 ,Mich 284; 169 NW 901 (1918), this Court enjoined the establishment of a "pesthouse" (hospital for contagious diseases) that was to be operated by the city pursuant to its charter. The Court followed *Barth v Christian Psychopathic Hosp Ass'n,* 196 Mich 642; 163 NW 62 (1917),[70] and *Saier v Joy,* 198 Mich 295; 164 NW 507 (1917); here, as in those cases,

> there might be no actual danger if properly conducted, but . . . maintenance [of the facilities] in close proximity to the home would create . . . dread and fear in the mind of the normal person . . . [thus] reducing the value of the property so situated . . . . [A] *pesthouse may be so conducted, and well-regulated ones are, as to cause no actual danger to nearby residents.* But substantially all the experts who testify to this effect agree that *their opinion is not shared by the general public, and that the normal person has a horror and dread of a pesthouse, and a fear of infection from proximity to it.*[71]

[70] In *Barth,* pp 646-647, a psychiatric hospital was proposed in a residential neighborhood. The trial court refused to hear testimony relating to "fear and danger of violence from escaping inmates" or "danger and fear of infection from disease." This Court enjoined the hospital, finding, despite the lack of a factual record, that it "would destroy the comfort, the well-being, and the property rights of the plaintiffs."

[71] *Birchard,* 204 Mich 286 (emphasis added).

See *Brink v Shepard,* 215 Mich 390, 392; 184 NW 404 (1921), addressing a tuberculosis sanitarium in a residential district:

> In [*Barth*] the trial judge dismissed the bill without taking the testimony, but in [*Saier* and *Birchard*] the testimony was quite persuasive, as it is in the instant case, that *the institution if properly conducted would cause no actual danger to nearby residents, that there was little or no danger of communicating disease such a distance as intervened between the plaintiffs' residences and the defendant's institution, but as in those cases the fear of the disease being communicated is present.* [Emphasis added.]

The normal and emotionally justified but factually unfounded fears of third parties cannot properly be dismissed as "conjectural, transitory and ephemeral."[72] Nor should plaintiffs who can establish at trial that their property has declined in value through the agency of such fear be required to await beneficent market forces that might ameliorate their losses.[73]

We again emphasize that the claimed decline in the value of the instant plaintiffs' homes appears to be attributable to factually founded as well as unfounded fear.[74]

C

Courts in other jurisdictions addressing the

The Court enjoined maintenance of the facility partly on the basis of the plaintiffs' financial loss: "[P]roperty values in this locality are at least 25 per cent. lower with the sanatorium there than they would be without it." *Id.,* p 393.

See also *Falkner v Brookfield,* 368 Mich 17, 22-25; 117 NW2d 125 (1962), reaffirming the rule of *Saier* and *Rockenbach.* In *Falkner,* this Court reversed dismissal of the claim that operation of an automobile junkyard constituted an enjoinable nuisance. The holding was based in part upon plaintiffs' claim that proximity to the operation would be depressing, elicit fear in the minds of local residents, and reduce property values in the neighborhood.

[72] *Good Fund, Ltd—1972 v Church,* 540 F Supp 519, 534 (D Colo, 1982), quoted by the majority, *ante,* p 313.

[73] At *ante,* p 308, the majority touches on the "temporal" aspect of the traditional nuisance action, stating that "nuisance normally required some degree of permanence. If the asserted interference was 'temporary and evanescent,' there was no actionable nuisance. This requirement is normally subsumed in the question whether the interference with the use and enjoyment of property is substantial." (Citation omitted.)

Plaintiffs may recover damages for property depreciation only insofar as they are able to prove at trial that the damage to their property is permanent, as would be demonstrated by sale or appraisal. Transient or temporary diminution of value, by contrast, is compensable by reference to the disparity in equivalent *rental* value for the period during which the property was deleteriously affected by defendants' conduct. 66 CJS, Nuisances, § 175, pp 978-979.

[74] The majority finds "cases involving . . . businesses moving into otherwise long-established residential neighborhoods" an inappropriate basis on which to permit the instant plaintiffs to proceed to trial. *Ante,* p 315, n 32. Defendants similarly distinguish *Brink,* n 71 *supra,* in part on the ground that *Brink* involved an exclusively residential neighborhood in which a sanitarium would be inappropriate, while

effect of fear on property values in nuisance actions have also recognized that the relevant inquiry is not whether a fear is factually founded, but whether it is the normal consequence of the defendants' conduct.[75] In *Everett v Paschall, supra,*[76] much as in the instant case, the trial court had agreed with the defendants

that there is no real danger; that the fear or dread of the disease is, in the light of scientific investiga-

the instant plaintiffs' homes are situated near a district containing some industrial property.

Plaintiffs allege that defendants negligently or intentionally permitted toxic chemicals and industrial waste to contaminate ground water that supplies private residences. Such activity is inappropriate to any neighborhood, whether or not exclusively residential. Further, although the "character of the locality" is always relevant to a finding of nuisance, see 4 Restatement Torts, 2d, § 827, comment g, pp 127-128, it is particularly important in actions for injunction.

[75] Particularly in pollution cases, third parties' contributions to a nuisance do not exonerate the defendant. See 4 Restatement Torts, 2d, § 840E, p 177. Like the defendants in *Exxon,* n 16 *supra,* and *Good Fund,* n 72 *supra,* the Thomas Solvent defendants urge that they are not responsible for the fears of third parties forming the potential market for plaintiffs' property. Because the instant defendants would remain liable even if the third parties' conduct were tortious, the intermediation of wholly innocent third parties does not relieve defendants of liability, especially where, as here, the apprehensions of such parties are foreseeable.

Similarly, the portion of the Restatement addressing liability in nuisance states, in a comment on causation:

In some cases the physical condition created is not of itself harmful, but becomes so upon the intervention of some other force—the act of another person or force of nature. In these cases *the liability of the person whose activity created the physical condition depends upon the determination that his activity was a substantial factor in causing the harm, and that the intervening force was not a superseding cause.* [*Id.,* § 834, comment f, p 151. Emphasis added.]

[76] In *Everett,* the court held that maintenance of a tuberculosis sanitarium in a residential district, leading to depreciation in property values ranging from thirty-three to fifty percent, was an enjoinable private nuisance even though the popular fears leading to the depreciation were scientifically unfounded.

tion, unfounded, imaginary, and fanciful; and that *the injury, if any, is damnum absque injuria.*[77]

The Washington Supreme Court, focusing on emotional reaction *as a factual reality of the case,* concluded that the hospital would interfere with "the comfortable enjoyment of the property"[78] to which the plaintiffs were entitled. The court rejected the argument that, because the fear was "unfounded and unsustained by science, a demon of the imagination—the courts will take no account of it . . . ." The court said:

> [W]e question our right to say that the fear is unfounded or unreasonable, *when it is shared by the whole public to such an extent that property values are diminished. The question is, not whether the fear is founded in science, but whether it exists;* not whether it is imaginary, but whether it is real, *in that it affects the movements and conduct of men. Such fears are actual, and must be recognized* by the courts as other emotions of the human mind.[79]

---

[77] *Id.,* 61 Wash 50 (emphasis added).

[78] *Id.,* pp 50-51.

[79] *Id.,* p 51 (emphasis added).

The court similarly honored common but scientifically dubious fears in a nuisance action for injunction, *Ferry v Seattle (On Rehearing),* 116 Wash 648; 203 P 40 (1922) (reservoir eliciting fear of disaster and loss of life), and a nuisance action for damages, including property depreciation, *Champa v Washington Compressed Gas Co,* 146 Wash 190; 262 P 228 (1927) (gas plant eliciting fear of personal injury and property damage).

See also *Baltimore v Fairfield Improvement Co,* n 56 *supra,* enjoining the placement of a woman with leprosy in a residential district. The City of Baltimore was held to be committing a public nuisance with respect to adjoining properties. Irrespective of the actual risk of contagion, the public was terrified of lepers, with resulting injury to neighbors' property values and sense of well-being. The court said:

> It is not, in this case, so much a mere *academic inquiry* as to whether the disease is in fact highly or remotely contagious; but *the question is whether, viewed as it is by the people generally,* its introduction into a neighborhood is calculated to

D

The majority of jurisdictions addressing the question holds that when property owners are awarded damages in compensation for diminution of property value attributable to easements for power lines, gas or oil pipe lines, or related structures, the elements and measure of compensation include potential purchasers' fear or apprehension of danger. Most of these authorities hold that because such fears in fact materially affect property values, they should be included in the calculus of damage.[80]

The court in *Texas Electric Service Co v Nelon,* 546 SW2d 864, 868 (Tex Civ App, 1977), adopted a typical formulation addressing normal fear that depresses the value of the subject property:

"[To determine market value after a taking, fear is relevant if] there is a *basis in reason or experience* for the fear; [the] fear *enters into the calculations of persons who deal in the buying and selling of similar property;* and . . . [d]epreciation of market value *because of the existence of such fear.*" [Emphasis added.]

Like *Everett v Paschall, supra,* condemnation cases illustrate that *the relevant "truth" is not whether there is actual danger, but whether the*

do a serious injury to the property of the plaintiff there located. [*Id.,* 87 Md 365. Emphasis added.]

[80] See anno: *Fear of powerline, gas or oil pipeline, or related structure as element of damages in easement condemnation proceeding,* 23 ALR4th 631, §§ 2[a], 5, 6.

A number of jurisdictions require that fears, to be compensable, must be reasonable. Reasonableness is variously defined; it may refer to fears experienced by ordinary persons whether or not grounded in fact, or, more stringently, to fears "grounded in scientific observation." All jurisdictions holding that fears of prospective purchasers are compensable require the property owner to demonstrate that such fears in fact adversely affected property value. *Id.*

*average person interested in the plaintiff's property believes there is danger.* The market, of course, behaves accordingly, and the fortunes of property owners follow. As the court in one easement case observed:

> The argument . . . that there is no real danger or reason for such fear has no force against the fact that *the fear exists and is unavoidable. The fear of danger in some cases is as bad as the danger itself—it is a condition—not a theory.*[81]

E

Plaintiffs have not alleged the existence of a condition that *no reasonable person of ordinary sensibilities* could find worrisome or offensive.[82]

A particular use of neighboring land may be offensive to some persons and not to others. Accordingly, for both hypersensitive and insensitive property owners, "[r]ights and privileges as to the use and enjoyment of land are based on the general standards of normal persons in the community and not on the standards of the individuals who happen to be there at the time."[83] The Restatement explains that a hypersensitive invalid

> cannot found an action for a private nuisance upon the normal ringing of a church bell across the street from his house, on the ground that the noise . . . throws him into convulsions and threatens his health or even his life, if a normal member of the community would regard the sound as unobjectionable or at most a petty annoyance. . . .

---

[81] *Texas Pipe Line Co v Nat'l Gasoline Co,* 203 La 787, 794; 14 So 2d 636 (1943) (emphasis added).

[82] The majority declares that "*reasonable minds cannot differ* that diminished property value based on unfounded fear is not a substantial interference in and of itself." *Ante,* p 313 (emphasis added).

[83] 4 Restatement Torts, 2d, ch 40 (Nuisance), § 821F, comment d, p 106.

On the other hand, when the invasion is of a kind that the normal individual in the community would find definitely annoying or offensive, *the fact that those who live in the neighborhood are hardened to it and have no objection will not prevent the plaintiff from maintaining his action.* For example, the noise of a boiler factory next door may be a private nuisance even though the plaintiff and others who live in the vicinity are stone deaf and cannot hear it. *The deafness of the plaintiff himself will affect the damages that he can recover, but it does not prevent the existence of a genuine interference with the use and enjoyment of his land as, for example, for the purpose of entertaining guests.*[84]

The instant plaintiffs, by virtue of superior knowledge and the lapse of time, might be inured to any fears manifesting themselves in property depreciation in their neighborhood. Nonetheless, just as a deaf plaintiff suffers a "genuine interference with the use and enjoyment of his land" when the use of neighboring property reduces the willingness of other persons to visit his property, plaintiffs here should be able to recover damages for a "genuine interference with the use and enjoyment of [their] land" if defendants' use of neighboring property reduces the willingness of potential purchasers to occupy property in the neighborhood, substantially and adversely affecting the value of plaintiffs' property.

F

The majority rejects plaintiffs' claim that the *conduct of defendants,* rather than negative publicity or the "unfounded fears of third parties,"[85]

---

[84] *Id.* (emphasis added).

[85] *Ante,* p 316.

caused an interference with plaintiffs' interest in the use and enjoyment of property.[86]

One might hypothesize a category of cases in which "negative publicity" only remotely connected with the defendant's conduct adversely affects the value of the plaintiff's property, but defendants have not established that the instant case belongs in such a category.[87] Notwithstanding the majority's concerns, plaintiffs have not asked to be excused from the "requirement that a litigant seeking to recover for nuisance must show . . . a significant interference with the use and enjoyment of land."[88] It is rather the majority that, by deciding this case on its own factual assumptions and barring remand for trial, has prevented plaintiffs from making such a showing.

G

Manifesting greater concern about the diffusion of liability than the instant defendants are alleged to have shown for the diffusion of hazardous waste, the majority sounds an alarm:

> Under [plaintiffs'] theory, a cause of action could be stated on behalf of any individual who could demonstrate an effect on property values even if the polluted ground water had neither strayed from defendants' own property, nor disturbed a plaintiff's enjoyment by the fear that it would do so.[89]

The majority's hypothetical case, in which con-

---

[86] *Id.*, pp 297, 306.

[87] There is no need for concern about "'sanctioning actions in [nuisance] by every landowner within a hundred miles of a manufacturing plant'" or other source of ground water contamination. See majority opinion, *ante,* p 310, n 23, discussing *Bradley v American Smelting & Refining,* 104 Wash 2d 677; 709 P2d 782 (1985).

[88] *Ante,* p 309.

[89] *Id.*, p 318.

tamination never "strayed from defendants' own property,"[90] is counterfactual; plaintiffs allege that contamination "strayed" from defendants' facilities, and rendered homes in the neighborhood unsafe to inhabit.[91]

VI

The majority concludes by animadverting upon a claim that recognition of the instant plaintiffs' cause of action might lead to "reordering of a polluter's resources for the benefit of persons who have suffered no cognizable harm at the expense of those claimants who have been subjected to a substantial and unreasonable interference in the

[90] *Id.*

[91] The majority's hypothetical case is also unenlightening, because plaintiffs' claim seeking damages for property depreciation caused by defendants' conduct does not depend on migration of pollution from the defendants' property to plaintiffs' property.

The majority states that "courts have typically rejected liability where a litigant failed to establish *proximity* between the asserted interference and the litigant's property. See, e.g., *Renaud v Martin Marietta Corp,* 749 F Supp 1545; 32 ERC 1721 (D Colo, 1990)." *Id.,* p 308, n 17 (emphasis added).

*Renaud* turned on the question whether the plaintiffs adequately demonstrated a chain of causation involving the health effects of contaminants originating on property of the defendants. The court in *Renaud* granted summary judgment in favor of the defendants because the plaintiffs had failed to make out a "prima facie case of causation." *Renaud,* 749 F Supp 1555. The plaintiffs, a group of community members, alleged that they had been *physically injured* by contamination present in a water treatment plant located downhill and downstream from a Martin Marietta facility generating large quantities of toxic waste. The court held that, having failed to refute the defendants' epidemiological evidence or to present appropriate epidemiological findings of their own, the plaintiffs had not sustained their burden of demonstrating exposure to the contaminants at levels sufficient to cause the claimed injuries.

The instant case presents no dispute whether contamination has migrated from defendants' to plaintiffs' property or has adversely affected plaintiffs' *health.* Rather, plaintiffs seek an opportunity to prove that the value of their property has been diminished as a result of the contamination of neighboring land. Plaintiffs (whose property was not contaminated) and their neighbors (whose property was contaminated) may have suffered distinct and independent injuries to their respective property rights by the same conduct of defendants.

use and enjoyment of property."[92] The majority observes that polluters sometimes seek refuge in the bankruptcy courts "as a result of clean-up costs required under various statutes and private litigation seeking money damages for injuries due to the contamination," and that Thomas Solvent Company did so in 1984.[93]

The majority's fears are unfounded—possibly the only truly unfounded fears in this case. We doubt that actions of the kind before us today would even ripple the surface of the sea of troubles that engulfed the instant defendants as a result of their handling of toxic waste.[94] In any event, we are not swayed by the suggestion that to permit the instant plaintiffs to proceed to trial is to threaten the rightful recoveries of individuals stricken with disease of environmental etiology, or of communities blighted by toxic waste. Again, trial courts possess sufficient discernment to resolve the problems of proof presented by the instant case.

---

[92] *Ante*, pp 318-319.

[93] *Id.*, p 319, n 38.

Plaintiffs amended their complaint in 1985 to add a fraudulent conveyance claim, alleging that the Thomas Solvent corporate defendants had been reorganized, and their assets shifted, on the eve of the April 1984 filing of a Chapter 11 petition. See *In re Thomas Solvent Co*, unpublished ruling of the United States Bankruptcy Court (WD, Mich), decided April 6, 1984 (Docket No. 84-00843). Under bankruptcy law, 11 USC 101 *et seq.*, and the law of fraudulent conveyance, MCL 566.11 *et seq.*; MSA 26.881 *et seq.*, plaintiffs were "creditors" of the Thomas Solvent corporate defendants by virtue of plaintiffs' claims against such defendants. Plaintiffs alleged that the reorganization and transfer of assets unlawfully hindered plaintiffs' ability to recover damages from the Thomas Solvent corporate defendants.

[94] In addition to the action underlying the instant appeal, at least two other actions have been commenced against the Thomas Solvent defendants, each involving a number of plaintiffs and similar claims. See *Allen v Thomas Solvent Co*, No. 84-3331 (Calhoun Circuit Court), and *Anthony v Thomas Solvent Co*, No. 88-660 (Calhoun Circuit Court). Plaintiffs in the instant case and the *Allen* case have alleged that certain Thomas Solvent defendants entered bankruptcy as a preëmptive maneuver with respect to such actions.

We would affirm the judgment of the Court of
Appeals and remand to the trial court for further
proceedings.

CAVANAGH, C.J., concurred with LEVIN, J.


APPENDIX


We here further respond to observations in the
majority opinion concerning *Smith v Western
Wayne Co Conservation Ass'n,* 380 Mich 526, 543;
158 NW2d 463 (1968), and *Gunther v E I DuPont
de Nemours & Co,* 157 F Supp 25 (ND W Va,
1957).


A


The majority cites *Smith* for the proposition that
"a cause of action for nuisance may not be based
on unfounded fears."[95]

The *Smith* plaintiffs asserted that operation of a
gun range in the neighborhood adversely affected
the value of their property, supporting this claim
with evidence of the noise of the gun range.[96] The

_____

[95] *Ante,* p 312. The majority states:

   In *Smith,* the plaintiffs sought to have a gun range declared
   a nuisance, *contending that it created fear of injuries, thus
   decreasing their property values.* Adopting the trial court's
   opinion that "no real or actual danger" existed from the use of
   the gun range, the Court further held that, even assuming a
   decrease in property values, this was not "in itself sufficient to
   constitute a nuisance." *Id.,* pp 542-543. [Emphasis added.]

[96] The trial court said:

   "In brief, it is the claim of plaintiffs that the noise from the
   use of defendants' range is so deafening that it impairs their
   rights 'to the peace, rest and comfort of their homes'; and that

plaintiffs did *not,* however, claim that "fear of injuries" from operation of the gun range "decreas[ed] their property values,"[97] but rather " 'that the range . . . endangers the lives and property of persons living in the area; and that even if found safe, the fears in the minds of the residents resulting from its operation and use render it a nuisance.' "[98] The plaintiffs in *Smith* sought to enjoin operation of the gun range as a nuisance in fact; evidence relating to property values was offered in support of this plea, but, as in *Warren Twp* and *Plassey, damages for lost value formed no part of the relief requested.*

The primary focus of the opinion in *Smith* was not safety, but noise. The trial court reviewed testimonial and demonstrative evidence of the degree of disturbance caused by operation of the range, and found that the noise was not " 'such as would shock a person of ordinary sensibilities or cause actual physical discomfort.' "[99] The trial court declared itself " 'convinced that no real or actual danger exists from the use of defendants' range,' "[100] and said that relief cannot

"be granted to plaintiffs merely on the claim that

> unless such use is abated, it will soon drive them out of their homes and *result in irreparable damage to the owners of the trailer court, who will lose their tenants and be prevented from obtaining new tenants."* [*Id.,* p 536. Emphasis added.]

For rental properties such as the trailer court, market value is directly dependent on rent and occupancy levels.

[97] *Ante,* p 312.

[98] *Smith, supra,* p 541.

[99] *Id.,* p 541. In holding that the noise was therefore not a nuisance subject to abatement, the trial court took into account " 'the character of the area,' " which was " 'undeveloped, open agricultural country' " with " ' "no residential or industrial development" ' " except for the trailer court occupied by the plaintiffs. *Id.,* pp 543, 542, and 531 (quoting *Smith v Plymouth Twp Bldg Inspector,* 346 Mich 57, 60-61; 77 NW2d 332 [1956]).

[100] *Id.,* p 542.

there 'exists' a fear *in their minds,* even though there is no actual danger. *Mere apprehension is insufficient to grant injunctive relief* against a claimed nuisance."[101]

The instant plaintiffs do not seek an injunction, and assert no claim for any kind of relief arising out of their own "fears" (founded or not).[102]

B

*Gunther* said by the majority to "exemplif[y]

---

[101] *Id.,* p 543 (emphasis added).
The trial court in *Smith* also said:

"Whether the presence of the range affects the market value of surrounding properties is disputed between the parties. . . . Assuming, however, that some decrease in value would result, this is not in itself sufficient to constitute a nuisance. *Warren Twp School Dist v City of Detroit, supra.*" [380 Mich 543.]

This assertion of the trial court is independent of the assertion in the paragraph previously quoted; because the two rulings appear in a seriatim discussion of the plaintiffs' arguments for an injunction, no logical or doctrinal connection between property values and the alleged nuisance created by the *plaintiffs'* fear was implied.

*Warren Twp* constitutes the sole authority for this portion of *Smith.* The holding goes no further than *Warren Twp* itself: Prospective operation of a lawful business, not shown to be a nuisance, is not transformed into an enjoinable nuisance merely by evidence that neighboring property values may decline, particularly where, as in *Smith,* the evidence of such decline is speculative and equivocal.

[102] The Restatement explains:

In determining whether the harm would be suffered by a normal member of the community, *fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact.* Thus the presence of a leprosy sanitarium in the vicinity of a group of private residences may seriously interfere with the use and enjoyment of land because of the normal fear that it creates of possible contagion, even though leprosy is in fact so rarely transmitted through normal contacts that there is *no practical possibility* of communication of the disease. [4 Restatement Torts, 2d, § 821F, comment f, p 107. Emphasis added.]

this reluctance to find a nuisance for mere diminution of property value on the basis of unfounded beliefs or fear of injury,"[103] is similar to *Smith.* The plaintiffs' home was located approximately two miles from a site used by the defendant for testing explosives.[104] The court refused "the extraordinary remedy of injunction,"[105] not damages, where the plaintiffs had failed to show any cognizable interference with their use or enjoyment of property.[106]

*The plaintiffs presented no evidence of property depreciation and did not request damages therefor.* The court declined to enjoin the defendant's business on the basis of the plaintiffs' "unfounded" belief "that the test blasting had injured them"[107] only after *expressly finding that none of their underlying allegations were supported by the evidence.*

The jury in *Gunther* found, in response to questions submitted by the court, that the testing operations had not caused physical damage to the

---

[103] *Ante,* p 311.

[104] The area of the test site, near a state forest, was "devoted largely to timbering and agricultural pursuits" and also included coal mines. *Gunther,* 157 F Supp 27.

[105] *Gunther,* 157 F Supp 33.

[106] The court determined that there had been *no showing of negligence by the defendant.* The court's opinion addressed the availability of compensation for property damage and for personal injuries to Mrs. Gunther, and the propriety of enjoining the testing activity as a private nuisance. The plaintiffs alleged property damage, property depreciation, and personal injury in support of their request for injunction.

[107] *Id.* (emphasis added).

Plaintiffs' subjective belief that they had been harmed by the defendant's activity was "unfounded" because it conflicted not simply with scientific inquiry, but with the standard for actionable nuisance: The court found that, unlike the plaintiffs, ordinary members of the affected community did *not* find the sound of the testing to interfere with their enjoyment of property. 157 F Supp 32.

plaintiffs' property[108] or personal injury to Mrs.
Gunther.[109]

Thus, in the words of the majority, "not only
ha[d] these plaintiffs not alleged significant inter-
ference with their use and enjoyment of property,
they do not here posit any interference at all."[110]

The court in *Gunther* held that characterization
of noise as a nuisance "depends on its effect on a
person of ordinary sensibilities, *not* the effect on a
particular individual."[111] Testimony of local resi-
dents did not establish that the noise of the defen-
dant's business met this standard. Addressing one
of the plaintiffs' claims of ·personal injury, the
court said:

> Mrs. Gunther stated that she was frightened by
> each test explosion and became nervous and upset.
> However, she admitted that she was quite nervous

[108] The plaintiffs claimed that the testing operations had produced
cracks in the structure of their home and other ill effects. Neighbor-
hood residents testified with regard to whether vibration had dam-
aged their properties since testing began. The court found that the
conflicting nature of this testimony, the expert structural and seismo-
logical evidence offered by the defendant, and the existence of alter-
native theories that could explain the injury to the Gunthers' prop-
erty, justified the jury's conclusion that the testing had not caused
any property damage.

[109] The court had propounded two further questions to guide it in
determining whether the testing operations "constitute a private
nuisance, and if so, whether such operations should be enjoined."
*Gunther,* 157 F Supp 30. The jury answered negatively a question
whether the defendant's operations were an unreasonable use of the
testing site. The question whether the defendant's operations "inter-
fere with, interrupt or adversely affect the reasonable, proper and
safe use and enjoyment" of the plaintiffs' properties, *id.,* p 29, was
withdrawn from the jury's consideration before an answer was
reached.

[110] *Ante,* p 314.

The jury in *Gunther* had found that the defendant was not using
the testing site unreasonably; the court observed that "[t]he testing
operations, in themselves, are not unlawful in any particular . . . ."
157 F Supp 33. Although the jury was not permitted to address the
explicit question whose answer would have been weighed against this
determination, the evidence showed no "interference with . . . sleep,
social life or other usual home activities" except to the extent experi-
enced by a plaintiff whose hypersensitivity was apparently not dis-
puted. *Id.*

[111] *Gunther,* 157 F Supp 32 (emphasis in original).

over the pending litigation and that she became
nervous when she drove a car in traffic or went
shopping. The evidence disclosed that Mrs. Gun-
ther has suffered from a nervous disorder almost
all of her adult life.[112]

The court declined to enjoin the defendant's
testing operations, an aspect of a lawful business
carried on without negligence, because the plain-
tiffs had shown no cognizable tangible *or* intangi-
ble injury to their property or their persons.[113] In
particular, the court did not credit the plaintiffs'
only remaining basis for injunction, property de-
preciation, because the only evidence was a subjec-
tive account of Mrs. Gunther's personal belief in
harm, *not supported by the experience of normal
members of the affected community.*[114]
In contrast, it is precisely the claim of the
instant plaintiffs that normal members of the
community in which they live were alarmed by

112 *Id.*

113 The plaintiffs failed to show a tangible injury to property or
person, and also failed to demonstrate a cognizable *intangible* injury,
such as disturbance of the use of the plaintiffs' home, or property
depreciation traced to unlawful conduct of the defendant that made
normal members of the community reluctant to occupy or purchase
the plaintiffs' property.

It was in this context that the court reasoned that the plaintiff's
"enjoyment of the property [had not] been lessened, in the sense that
a court should or will grant *injunctive* relief," *Gunther,* 157 F Supp
33 (emphasis added), except insofar as "*they believed* that the test
blasting had injured them. If such belief is unfounded, what is left
other than depreciation in value? Mere diminution of the value·of
property because of the use to which adjoining or nearby premises is
devoted, if unaccompanied with other ill results, is *damnum absque
injuria* \ . . ." *Id.*

114 Apparently relying on *Gunther* and *Winget,* n 35 *supra,* the
majority contends that because "plaintiffs make no claim for relief
arising out of their own 'fears' " but instead seek damages for prop-
erty depreciation reflecting popular fears, "defendants' activities have
not interfered with [plaintiffs'] use and enjoyment of property." *Ante,*
p 311 and n 25. The law of nuisance does not, however, condition an
award of damages for property depreciation on the degree to which
the plaintiff shared the sensibilities of the community.

the prospect of occupying property in the vicinity of contaminated soil or ground water, and were therefore unwilling to pay the former market price for any property in the vicinity.[115]

---

[115] At *ante,* p 313, n 29, the majority also cites *McCaw v Harrison,* 259 SW2d 457, 458 (Ky, 1953), *Miller v Cudahy Co,* 567 F Supp 892, 897-898 (D Kan, 1983), and *O'Donnell v Oliver Iron Mining Co,* 273 Mich 27; 262 NW 728 (1935).

*O'Donnell,* a negligence action, addressed speculative future harm only. The result turned on application of damage rules peculiar to subsidence cases. The plaintiff alleged no interference with the use and enjoyment of property, but claimed as an element of damages that his property would be devalued if prospective purchasers were concerned about future subsidence due to the withdrawal of lateral support. The Court disclaimed any ruling "for the case in which it clearly appears beyond any question that the damages, although *in futuro,* are bound to occur." *Id.,* 273 Mich 40. The Court applied an English rule not generally adopted by United States jurisdictions, governing damages in subsidence actions, where the focus is on ascertainable completed physical harm to the property: "[P]rospective damages may not be recovered in such an action and . . . a new action must be brought each time a new damage occurs . . . ." *Id.,* pp 41-42. See, generally, 4 Restatement Torts, 2d, ch 39 (Interests in the support of land), pp 62-82; McCormick, Damages, § 127, pp 500-515.

In *Miller,* the plaintiffs offered to demonstrate that pollution would reach their property in the future (cf. *O'Donnell),* but apparently did not offer evidence of current property depreciation.

*McCaw* is discussed in n 16.